# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3019

_____

United States of America,      *

     *

     Plaintiff - Appellee,      *

     *      Appeal from the United States

     v.      *      District Court for the Eastern

     *      District of Missouri.

Amesheo D. Cannon,      *

     *

     Defendant - Appellant.      *

_____

Submitted: October 19, 2006
Filed: January 31, 2007

_____

Before MELLOY, BENTON, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

Amesheo D. Cannon was indicted on murder for hire and conspiracy to commit murder for hire charges pursuant to 18 U.S.C. §§ 1958 and 2. The government sought the death penalty. After hearing the evidence at trial, the jury convicted Cannon of the conspiracy charge, but acquitted him of murder for hire, and sentenced him to life in prison without the possibility of parole. Cannon appeals the trial court's[1] denial of his motion for a judgment of acquittal based on the insufficiency of the evidence. He

_____

[1]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

also appeals the court's decisions to remove a juror who claimed to have emotional problems, to deny Cannon's motion to adjourn trial to take a Rule 15(a) deposition, and to exclude from evidence the government's file on a co-conspirator. We affirm.

I.   Background

Because Cannon challenges, among other things, the sufficiency of the evidence, we present the facts in the light most favorable to the verdict. United States v. Shepard, 462 F.3d 847, 853 (8th Cir. 2006).[2]

In the early morning hours of August 21, 2000, police found Coy Smith shot to death in his bed. Smith was a private citizen who had been working with law enforcement in the area to make controlled drug purchases from local drug dealers. On August 10, 2000, Smith had testified against Cannon's friend, Tyrese Hyles ("Tyrese"), at a preliminary hearing in a state drug case. At the time of Smith's murder, Tyrese was being held in Pemiscot County Jail in Caruthersville, Missouri pending trial in the state drug prosecution. Cannon lived in Memphis, Tennessee, where he was under parole supervision. Tonya Johnson Hyles ("Tonya"), Tyrese's wife, lived in Caruthersville, Missouri.

---

[2]Cannon challenges the credibility of several trial witnesses, many of whom were cooperating witnesses and received substantial benefits from the government in exchange for their testimony. This fact was made clear to the jury, however, during direct and cross examination, and our charge on appeal is not to assess the credibility of witnesses. See United States v. Tabor, 439 F.3d 826, 829 (8th Cir. 2006) ("We have repeatedly upheld jury verdicts based solely on the testimony of co-conspirators and cooperating witnesses, noting that it is within the province of the jury to make credibility assessments and resolve conflicting testimony.").

## A. Criminal Conduct

After Smith testified against Tyrese at an August 10, 2000 preliminary hearing, Tyrese approached David Carter, Tyrese's cellmate in the Pemiscot County Jail, and asked him if he would kill Smith. Tyrese offered to bail Carter out of jail and said he would give Carter a Pontiac Parisienne in return for killing Smith. Carter agreed. Tyrese then contacted his wife, Tonya, to make the necessary arrangements to bail Carter out of jail.

That same day, Tonya paid a bondsman to bail Carter out of jail. The collateral put up to secure the bond was the Pontiac Parisienne that Tyrese had promised Carter for the murder. The bail papers showed Carter as the owner of the car. After Carter was out of jail, Tonya drove him home in the Pontiac Parisienne.

Not long after he arrived home, Carter received a three-way call from Tyrese. Tyrese had called Tonya and she patched him through to Carter. Tyrese told Carter to go over to Tonya's house. Once he was there, Carter received another call from Tyrese, telling Carter that the murder weapon was on its way. Shortly thereafter, Samuel Anderson delivered a stainless steel, nine millimeter, semi-automatic handgun with a black handle to Tonya's house. Tonya had previously contacted Anderson, telling him that they were going to "take care of Coy's ass" and that Tyrese had sent her to get the gun. After Anderson left, Tonya turned the gun over to Carter.

Phone records showed several phone calls made to Tonya's residence on the evening of August 10, 2000. Two calls originated from Tyrese's cell in the Pemiscot County Jail. The calls were made at 7:50 p.m. and 8:34 p.m. and were consistent with the time frame when Tyrese was calling Carter to set up the transfer of the gun. Four calls came from Cannon's mother's house, where Cannon lived, in Memphis. These calls were at 8:11 p.m., 8:23 p.m., 8:39 p.m., and 8:43 p.m. The final call was fifty-one minutes long and overlapped with the second call from Tyrese's jail cell.

Several days later, April Leatherwood, Cannon's one-time girlfriend, received a call from Cannon. Cannon told her Tonya was driving him to Caruthersville from Memphis.

Anderson subsequently took the gun back from Carter and gave it to Cannon after Cannon arrived in Caruthersville. Cannon had asked Anderson for the gun and said he was going "to handle that for Little Tyrese."

On August 20, the afternoon before Smith's murder, Cannon was at the home of Omar Wiley. Wiley lived across the street and four houses down from Smith. Wiley saw a silver gun with a black handle in the Pontiac Parisenne, which Cannon was already driving. While Cannon was at Wiley's house, Smith drove by. When Cannon saw Smith, Cannon told Wiley, "I'm going to kill that nigger. He got my boy."

Later that evening, Cannon went to Leatherwood's house. Leatherwood lived around the corner from Smith's house. Before Leatherwood went to bed, she saw Cannon cutting eye holes out of a black scarf. At approximately 2:30 a.m. on August 21, Cannon woke Leatherwood and told her to take the Pontiac Parisenne to Tonya so Tonya could use it for work. Leatherwood returned to her apartment at about 2:45 a.m. and Cannon was not there. Cannon returned at about 3:00 a.m. with a juvenile. Cannon and the juvenile then left Leatherwood's house.

About twenty minutes later, Cannon returned to Leatherwood's apartment, where he soaked his pants in the bathtub and listened to a police scanner. When he heard a homicide report, Cannon called Wiley and told him to look out his window. Emergency vehicles were already at Smith's house.

An autopsy revealed that Smith had been shot three times with a nine millimeter, semi-automatic weapon. The fatal shot was behind the right ear, at close

-4-

range. Smith had been shot two additional times in the back. The investigation also found that the phone wires had been cut in Smith's house and the front light bulb had been unscrewed.

Several days after the murder, Anderson asked Cannon what he did with the gun. Cannon told him not to worry, he had taken care of it. Cannon then told Anderson about the murder. He said he went to Smith's house and unscrewed the front light bulb, disconnected the door knob, and entered the house. He said he went to the bedroom and shot Smith behind the ear. He said Mrs. Smith jumped out of the bed and hid in the closet. He said he then shot Smith again.

About a week after Smith was killed, Wiley overheard Cannon and Tonya arguing over the Pontiac. Cannon told Tonya that Tyrese had told Cannon he could have the car.

On August 29, 2000, Cannon was pulled over and issued a traffic summons by Captain Tony Jones of the Caruthersville Police Department. Cannon was driving the Pontiac Parisienne he had received from Tyrese. During discussions with Captain Jones about the car, Cannon told Captain Jones that Tyrese had given him the car.

B.    Pretrial Events

On October 18, 2001, the government indicted Cannon and Tyrese Hyles on murder for hire and conspiracy to commit murder for hire charges in violation of 18 U.S.C. §§ 1958 and 2. Tonya Hyles had been indicted on June 14, 2001, on murder for hire charges only. Her indictment was dismissed on October 24, 2001.[3] The government filed a superseding indictment against Cannon and Tyrese on December 13, 2001, charging the same crimes.

---

[3]The government indicted Tonya again on May 5, 2005.

While Cannon was being held in the Cape Girardeau County Jail, another prisoner, Marques Terry, overheard Cannon talking to Myron Woods, who was also a prisoner. Cannon told Woods he came to Caruthersville from Memphis "to shoot some dude" and that he had gotten the gun from Tonya.

On November 21, 2002, the government filed a second superseding indictment, adding grand jury findings on aggravating circumstances. The government filed a Notice of Intent to Seek the Death Penalty on December 6, 2002, and filed an Amended Notice of Intent to Seek the Death Penalty on March 4, 2003. Cannon moved for, and was granted, a motion to sever the parties for trial on June 27, 2003.

C.    Trial

Voir dire for Cannon's trial began on February 28, 2005. A death-qualified jury was empaneled on March 3, 2005. One day after the jury was empaneled and three days before trial was to begin, Juror Moenster submitted a letter from her doctor to the trial court stating that she was "emotionally wrought over being on the jury." The court brought the issue to the parties' attention the morning trial was to begin.

The court expressed skepticism, and felt the need to "talk to [Ms. Moenster] and ferret her out." While being questioned at the bench, Ms. Moenster stated, " I am not able to sit here for that length of time and listen to everything. Listening to people talk is really hard for me, and I'm just not comfortable. I get shaky, and I'm just totally overwhelmed by it." When asked why she had not expressed her emotional issues previously, Ms. Moenster replied, "I thought someone was going to talk to me before I was picked, and I was going to say something. No one brought up emotional problems." She stated that she did not respond to the voir dire questions regarding medical issues because she did not consider her emotional problem to be a medical problem and "[i]t is just hard to talk about this in front of a whole group of people." Under further questioning by defense counsel, Ms. Moenster said, "I don't take stress,

and this is just stressful for me." The government observed that Ms. Moenster's "voice is shaking . . . [and] [s]he is ready to go into tears now." She was "getting ready to hyperventilate." Defense counsel did not dispute the government's observations.

After hearing arguments from both parties, the trial court held:

[T]o allow her to stay on the jury would jeopardize the ability of both sides to get a fair trial because of what she has articulated here in relation to her emotional status or incapacity thereon or instability therein and what she has indicated in her letter that she brought from her doctor, statements that she made to a doctor about her emotional status, and especially her emotion about, quote, a case she doesn't even care about, I think it behooves the Court and it is therefore, incumbent upon me to release Ms. Moenster for the benefit of all parties concerned, especially for the benefit of the defendant, and I think that the defendant especially is the last person who needs to have a loose cannon sitting on a jury, which could explode.

Despite being "a little dismayed" with Ms. Moenster's late reporting of her problem, the court released her and replaced her with the first alternate, Mr. Kassebaum.

In the middle of the presentation of his case, Cannon moved to adjourn trial in order to depose Shemikia[4] Williams to preserve her testimony. Williams was nine months pregnant, fully dilated, and had been in and out of the hospital for the past several weeks. Cannon stated that he would offer Williams's testimony to attack the credibility of April Leatherwood. Specifically, Williams would testify that Leatherwood told her she was threatened by Officer Lockett. Williams would also testify that when she confronted Leatherwood about whether Cannon was involved in Smith's murder, Leatherwood told her that Cannon had been with her all night. The

---

[4]Ms. Williams's name is spelled several different ways in the record.

government argued that this testimony was cumulative, and the trial court agreed. The court denied Cannon's motions.

Cannon also sought to introduce the government's criminal file on Tonya Hyles, which included her indictment and the dismissal of her indictment, into evidence to challenge the credibility of Samuel Anderson and David Carter. Both Anderson and Carter had testified that Tonya was instrumental in obtaining the murder weapon and setting up the homicide. The government referred to Tonya several times during the trial, stating that she was a part of the conspiracy to murder Coy Smith.

The government objected to the introduction of the file, arguing that it was immaterial and irrelevant whether Tonya's case was dismissed because she was not a witness in the case. The government also argued that the evidence would be misleading. The court excluded the file from evidence, stating that it did not see the link between the dismissal of Tonya's indictment and Anderson's or the government's credibility.

At the close of the government's case and again after closing arguments, Cannon moved for a judgment of acquittal, based on the insufficiency of the evidence. His motion was denied. The jury found Cannon guilty of conspiracy, but acquitted him on the murder-for-hire charge. In the sentencing phase, the jury declined to sentence Cannon to death, instead sentencing Cannon to life in prison without the possibility of parole.

Cannon now appeals, arguing that: 1) there was insufficient evidence to support his conviction of conspiracy to commit murder for hire; 2) the trial court erred when it denied his motion to adjourn trial to allow him to take a Rule 15(a) deposition; 3) the trial court erred in releasing Juror Moenster for emotional reasons; and 4) trial

court erred in excluding Tonya's file. We address each of Cannon's arguments in turn.

II.    Analysis

A.    Sufficiency of the Evidence

Cannon first argues that the district court erred in denying Cannon's motion for acquittal based on the sufficiency of the evidence. Specifically, Cannon argues that no jury could reasonably find that he was a member of the conspiracy to kill Coy Smith or that his actions met the interstate commerce requirement of 18 U.S.C. § 1958. We review de novo a district court's denial of a motion for judgment of acquittal. United States v. Washington, 318 F.3d 845, 852 (8th Cir. 2003). We view the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict. Id.

Cannon does not contest the fact that a conspiracy to commit the murder for hire of Smith existed. Cannon argues that the government did not present sufficient evidence to prove beyond a reasonable doubt that Cannon joined the murder-for-hire conspiracy. To convict Cannon of conspiracy, the government had to prove that "there was an agreement to [to kill Smith], that [Cannon] knew of this agreement, and that [Cannon] intentionally joined this agreement." Id. at 853.

If a conspiracy has been established, as in this case, "the government must offer enough evidence to prove a defendant's connection to a conspiracy beyond a reasonable doubt before a conspiracy conviction can be upheld." United States v Lopez, 443 F.3d 1026, 1028 (8th Cir. 2006) (en banc). "Slight evidence" connecting the defendant to a conspiracy is not enough to support a conviction. See id. at 1029-

30. However, "[p]roof of a defendant's involvement in a conspiracy may of course be demonstrated by direct or circumstantial evidence." Id. at 1030.

Viewing the evidence in the light most favorable to the government, it was reasonable for the jury to conclude that Cannon was a part of the conspiracy.[5] The evidence supporting the verdict includes numerous phone calls from Cannon's mother's house to Tonya Hyles's home, the exchange of the murder weapon, and Cannon's statements demonstrating knowledge of how the murder was committed. Witnesses testified to direct statements from Cannon stating that he was going to kill or had killed Coy Smith. He was seen the day before the murder carrying the murder weapon and driving the Pontiac Parisienne, which the evidence showed was the consideration for the murder for hire.

Cannon's actions in the early morning hours on the date of the murder also support the jury's verdict. Leatherwood observed Cannon cutting eye holes in a black scarf. Around 3:00 a.m., Cannon left Leatherwood's house and then returned twenty minutes later. Leatherwood's house was close in proximity to Carter's house. Cannon then soaked his pants in the bathtub, listened to the police scanner, and called Wiley once he heard the report about Smith's murder. Cannon told Wiley to look outside at the emergency vehicles at Smith's house. The evidence is sufficient to show that Cannon joined the conspiracy.

Cannon also argues the government's evidence is insufficient because it does not prove the requisite connection between interstate commerce and the murder-for-

---

[5]Cannon urges us to look at the verdict of acquittal for the murder for hire charge when we draw all inferences from the evidence that support the jury's verdict. This is a misstatement of the law. The review of Cannon's conviction of conspiracy to commit murder-for-hire "should be independent of the jury's determination that evidence on another count was insufficient." United States v. Powell, 469 U.S. 57, 67 (1984); see also Washington, 318 F.3d at 853 n.5.

hire plot. The government had to prove that Cannon, or some other member of the conspiracy, conspired to "travel[] in . . . interstate or foreign commerce, or use[] . . . the mail or any facility of interstate or foreign commerce, with intent that a murder be committed . . . as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value . . . ." 18 U.S.C. § 1958(a). "'[F]acility of interstate or foreign commerce' includes means of transportation and communication." 18 U.S.C. § 1958(b)(2).

There was ample evidence offered by the government at trial to prove the interstate connection. There were four calls made from Cannon's mother's house in Memphis to Tonya's house, one of which overlapped with one of Tyrese's calls from jail. These calls were made in the context of Tonya's efforts to obtain a gun from Samuel Anderson so David Carter could kill Smith in exchange for the Pontiac Parisenne. Days later, Cannon called April Leatherwood and told her that Tonya was driving him to Caruthersville from Memphis. Once Cannon arrived in Caruthersville, Anderson gave him the same gun he had since received back from Carter. Cannon asked Anderson for the gun so that Cannon could "handle that for Little Tyrese." After the murder, Cannon told Myron Woods, his cellmate, that he came up from Memphis to Caruthersville "to shoot some dude."

Cannon argues that the government did not offer any evidence showing who the parties to the phone conversations were or that the topic of those conversation was the murder of Smith. Cannon asserts that the phone records offered at trial showed no difference in either the number or pattern of calls from Cannon's mother's house in Memphis and Tonya Hyles's house in Caruthersville once he allegedly became involved in the conspiracy. Cannon also argues that there is no evidence showing that he drove from Memphis to Caruthersville with the purpose of killing Smith.[6]

---

[6]There was some evidence at trial supporting Cannon's position. Hendrietta Nichols, Cannon's former girlfriend, testified that she lived with Tonya during the late summer of 2000, which is the time period in question. She testified that Cannon

-11-

Cannon relies primarily on <u>United States v. Sullivan</u>, 809 F. Supp. 934 (N.D. Ga. 1992). This case can be distinguished. In <u>Sullivan</u>, the only evidence offered to prove the connection between use of facilities of interstate commerce and the murder-for-hire plot was four phone calls between the defendant's home and a number of unknown people. Neither the "trigger man," nor any of his accomplices had been apprehended or identified at the time of the defendant's trial. In this context, the court granted defendant's motion for judgment of acquittal because the government did not prove "that the telephone calls related to the murder–that is, that they were in fact used in the commission of the offense." <u>Id.</u> at 937 (internal marks omitted).

In this case, the government offered more than just four phone calls with unknown parties. The government included evidence linking Cannon to several co-conspirators and a conspiracy that Cannon does not dispute exists. "[T]he jury may draw all reasonable inferences from [circumstantial] evidence." <u>United States v. Davidson</u>, 122 F.3d 531, 535 (8th Cir. 1997); <u>see also</u> <u>United States v. Basile</u>, 109 F.3d 1304, 1310 (8th Cir. 1997) ("We may affirm even if the evidence is entirely circumstantial."). When taken together with the other evidence at trial, such as Carter and Anderson's testimony and the timing of Cannon's calls and visit to Caruthersville, the phone calls between Memphis and Caruthersville provide, at the very least, sufficient circumstantial evidence to prove an interstate nexus. The district court did not err in denying Cannon's motion for acquittal.

---

sometimes called the house more than once a day during this time to talk to her about their relationship. Also, there was evidence showing that Cannon often came to Caruthersville from Memphis to visit. He grew up in Caruthersville and still had many friends there. However, when viewed in the light most favorable to the verdict, a reasonable jury could have concluded that Cannon spoke with Tonya and Tyrese over the phone, that Tyrese promised Cannon the Pontiac Parisienne in exchange for murdering Smith, and that Cannon drove from Memphis, Tennessee to Caruthersville, Missouri with the intent to murder Smith. <u>See</u> <u>United States v. One Star</u>, 465 F.3d 828, 833 (8th Cir. 2006) ("Assessing the credibility of witnesses is a matter properly left to the jury.") (internal marks omitted).

B. Rule 15(a) Deposition

Cannon next argues that the district court erred when it denied his motion to adjourn trial in order to take a Rule 15(a) deposition to preserve the testimony of Shemikia Williams. We review the denial of this motion for abuse of discretion. United States v. Adcock, 558 F.2d 397, 406 (8th Cir. 1977) ("Discovery matters are committed to the sound discretion of the trial court.").

Federal Rule of Criminal Procedure 15(a) allows a party to "move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion because of exceptional circumstances and in the interest of justice." Fed. R. Crim. P. 15(a)(1). To establish exceptional circumstances under Rule 15(a), "the moving party must show the witness's unavailability and the materiality of the witness's testimony." United States v. Liner, 435 F.3d 920, 924 (8th Cir. 2006).

There is no dispute that Williams was unavailable to testify at trial. Her testimony, however, was not material. Williams's testimony was cumulative. See Fed. R. Evid. 403. Cannon's counsel himself said "she would testify that April told her essentially what the other witnesses have said." Dyvonne Miller, for example, testified that Leatherwood told her that Officer Lockett threatened Leatherwood into lying. While Williams's testimony would contradict some of what Leatherwood said in court, Leatherwood's credibility had already been undermined by direct and cross examination and by the testimony of other witnesses. It was not error to deny Cannon's motion because Williams's testimony was cumulative.

Cannon also argues that his Sixth Amendment and Due Process rights were violated because the trial court infringed upon his right to call witnesses on his own behalf. The Due Process Clause gives defendants the "right to offer the testimony of witnesses, and to compel their attendance." Washington v. Texas, 388 U.S. 14, 19 (1967). The Sixth Amendment Compulsory Process Clause has been given broad

interpretation, which "necessarily encompasses the right to present witness testimony." Anderson v. Groose, 106 F.3d 242, 246 (8th Cir. 1997) (holding that the preclusion of a defendant's alibi witness's testimony as a sanction for violating a discovery rule was unconstitutional).

As Cannon recognizes, however, a defendant cannot establish a violation of his right to offer testimony merely by showing that a court deprived him of that testimony; rather, the defendant must "'at least make some plausible showing of how [the] testimony would have been both material and favorable to his defense.'" United States v. Turning Bear, 357 F.3d 730, 733 (8th Cir. 2004) (quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982)). Further, a denial of the right can constitute harmless error. Anderson, 106 F.3d at 246. As discussed above, the district court ruled that Williams's testimony would have been cumulative, and denied Cannon's motion to adjourn trial and take her deposition for this reason. This ruling was not arbitrary, see Turning Bear, 357 F.3d at 733, and at the very least constitutes harmless error.

C.     Dismissal of Juror Moenster

Cannon also argues the district court erred in dismissing Juror Moenster. "A district court's decision to remove or not remove a juror is reviewed for an abuse of discretion." United States v. Running Horse, 175 F.3d 635, 638 (8th Cir. 1999). We will uphold the district court's decision to remove a juror "if the record reflects a legitimate basis for it." United States v. Evans, 455 F.3d 823, 824 (8th Cir. 2006) (discussing the standard of review for excusing a potential juror for cause); see also United States v. Green, 428 F.3d 1131, 1135 (8th Cir. 2005) (applying the same standard to the district court's decision to retain a juror alleged to have been sleeping during trial).

We have never discussed a district court's decision to dismiss a juror because of emotional problems; however, several other circuits have held that the trial court's dismissal of a juror during trial for emotional issues is proper.  See e.g., United States v. Beard, 161 F.3d 1190, 1193-95 (9th Cir. 1998) (stating that "just cause" encompasses "all kinds of problems–temporary as well as those of long duration–that may befall a juror," and holding that dismissal of a juror because of her distraught emotional state was proper) (internal marks omitted); United States v. Huntress, 956 F.2d 1309, 1312-13 (5th Cir. 1992) (upholding the dismissal of a juror during deliberations because of mental illness).  We have held that illness of a juror is a legitimate reason for dismissal, United States v. McMasters, 90 F.3d 1394, 1402 (8th Cir. 1996), and Ms. Moenster's condition is arguably an illness.  The court here properly assessed Ms. Moenster's credibility and demeanor, and ultimately determined that justice would be better served if she was not on the jury.  Because emotional issues are a legitimate basis for dismissal, the dismissal was not in error.

### D.    Tonya Hyles's Indictment

Lastly, Cannon argues that the district court erred by excluding evidence showing that the government had dismissed Tonya Hyles's indictment.  "We review for clear abuse of discretion a district court's evidentiary rulings."  United States v. Chase, 451 F.3d 474, 479 (8th Cir. 2006).  We will reverse a conviction "only when an improper evidentiary ruling has affected substantial rights or had more than a slight effect on the verdict."  United States v. Naiden, 424 F.3d 718, 722 (8th Cir. 2005).

Cannon argues that the evidence in the government's criminal file on Tonya is relevant to demonstrate the "inconsistency of proceeding under the same evidence against Mr. Cannon, where such evidence could not sustain an indictment against Tonya."  This ignores the fact, however, that the indictment against Tonya was dismissed without prejudice because she was expected to be a cooperating witness in Cannon's trial.  Her name was on the witness list the government filed, and during

discovery Cannon received statements made by Tonya, as well as her proffer letter. The government dropped her from its witness list, however, because she was no longer willing to cooperate. After Cannon's trial, the government again indicted her. Thus, as the government argues, evidence of the dismissal of her indictment would have been misleading and was properly excluded. <u>See</u> Fed. R. Evid. 403.

Cannon's constitutional arguments are also without merit. Contrary to Cannon's argument, sharing information with the jury about a co-conspirator's charges or lack thereof *creates* the potential denial of a fair trial, not the contrary. <u>Cf</u>. <u>United States v. Barrientos</u>, 758 F.2d 1152, 1155 (7th Cir. 1985) ("Information regarding the reason for a co-defendant's absence is irrelevant to [the jury's] task. It only adds grist to the mills of speculation for the jurors to know that one defendant has admitted to guilt or that another has been found not guilty.").

III.   Conclusion

For the foregoing reasons, we affirm the district court's rulings and uphold Cannon's verdict.

_____