# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-4071

_____

United States of America,          *
                                    *

      Plaintiff-Appellee,    *

                                    *    Appeals from the United States

     v.                        *    District Court for the Southern

                                    *    District of Iowa.

Isabel Ramon-Rodriguez, also   *

known as Ramon Herrera-Cisneros,  *

                                    *

     Defendant-Appellant.  *

_____

No. 06-1339

_____

United States of America,          *
                                    *

      Plaintiff-Appellee,    *

                                    *

     v.                        *

                                    *

Felipe Mendez, Jr.,         *

                                    *

     Defendant-Appellant.  *

_____

No. 06-1572

_____

| United States of America, | * |
| | * |
| Plaintiff-Appellee, | * |
| | * |
| v. | * |
| | * |
| Cesar Daniel Gascon-Guerrero, | * |
| | * |
| Defendant-Appellant. | * |

_____

No. 06-2579

_____

| United States of America, | * |
| | * |
| Plaintiff-Appellee, | * |
| | * |
| v. | * |
| | * |
| Sergio Santamaria, | * |
| | * |
| Defendant-Appellant. | * |

Submitted: March 14, 2007
Filed: July 5, 2007

_____

Before MELLOY, SMITH, and BENTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

Four defendants in a drug distribution conspiracy appeal their convictions and sentences resulting from a joint trial. Arguments on appeal include claims that: there was insufficient evidence to support the convictions; an attorney labored under a conflict-of-interest; a <u>Terry</u> stop was constitutionally unreasonable and evidence found as a result of the stop should have been suppressed; drug quantity calculations at sentencing were clearly erroneous; prior convictions were improperly used to enhance sentences; and a "willful blindness" instruction was improperly submitted to the jury while a "single vs. multiple conspiracy" instruction was not. We affirm the judgment of the district court.[1]

I.      Background

We present the facts in a light most favorable to the verdicts, drawing all reasonable inferences from the evidence that support the jury's verdicts. <u>United States v. Cannon</u>, 475 F.3d 1013, 1016 (8th Cir. 2007). Details surrounding the investigation and events leading to the defendants' arrests were introduced at the joint trial of the four defendants largely through the testimony of officers engaged in investigation of the conspiracy. Co-conspirators who pleaded guilty and agreed to cooperate with the government testified as to their respective roles and provided details about the workings of the conspiracy and the roles of the present four defendants within the conspiracy. In addition, defendant Felipe Mendez, Jr. ("Mendez"), testified, and a number of inmates housed with the defendants relayed statements the defendants had made while incarcerated.

---

[1]The Honorable Robert W. Pratt, Chief Judge, United States District Court for the Southern District of Iowa.

Officers began investigating a suspected drug distribution conspiracy in December 2001. On January 2, 2003, officers stopped a white BMW containing twenty-two pounds of methamphetamine wrapped in eighteen packages. Walter Cruz DeJesus ("DeJesus") was driving the BMW, and his girlfriend, Jessica Johnson ("Johnson") was the passenger. DeJesus and Johnson were traveling from California to Iowa, and the BMW was registered in the name of DeJesus's mother-in-law. It was discovered that the registration for the BMW had only recently been transferred to DeJesus's mother-in-law and that it previously had been registered in another woman's name. The other woman was the wife of Mendez. DeJesus and Johnson stated that Mendez had enlisted the two of them to drive methamphetamine from California to Iowa and that they had made three to five prior deliveries with loads weighing between fifteen and twenty-five pounds each.

Later, in summer 2004, officers learned from confidential informants that a woman in Des Moines, Kathleen Boatwright ("Boatwright"), was a supplier of methamphetamine. Officers used the confidential informants to make a series of controlled purchases of methamphetamine from Boatwright and her boyfriend, Cody Cannon ("Cannon"), using money with recorded serial numbers. After the controlled purchases, officers obtained a search warrant for Boatwright's home. Before officers executed the search warrant, one of the confidential informants encountered Boatwright at a store where she was seen purchasing a suitcase and where she told the confidential informant she would be traveling to California. The confidential informant believed the trip to California was for the purpose of obtaining methamphetamine. Officers decided to wait to execute the warrant.

On July 8, 2004, still within the permissible window of time for executing the warrant, the confidential informant told officers that Boatwright had returned from California with a Hispanic male the informant believed to be Boatwright's source. Officers then conducted surveillance of Boatwright's home in preparation for execution of the warrant. Officers observed a Hispanic male on the front porch of

-4-

Boatwright's home and saw this man and a second Hispanic male leave Boatwright's home in a red Volkswagen Jetta. Officers then stopped the red Jetta and questioned and eventually arrested the two occupants of the car. While officers were processing the men from the Jetta, other officers executed the search warrant at Boatwright's home.

Mendez was the driver of the red Jetta, and defendant Sergio Santamaria ("Santamaria") was the passenger. Mendez told the officers he had a valid driver's license, but proceeded to hand the officers a California identification card bearing the name Anthony Gonzales. Officers saw a California driver's license in Mendez's wallet. The driver's license, like the identification card, had a picture of Mendez. The driver's license listed the name Felipe Mendez. Santamaria gave the officers an Iowa driver's license that bore his correct name. At the time of the traffic stop, officers were not certain of Mendez's and Santamaria's true identities, so they placed a call to Immigration and Customs Enforcement ("ICE") and obtained consent from Mendez and Santamaria to move them and the Jetta to a nearby police station. A subsequent criminal history check showed prior arrests and deportations for Santamaria in the name of Jaime Cabrera. The car was not registered to either of the men, and both men appeared to be in the United States illegally. Eventually, it was determined that Mendez and Santamaria were present illegally, and ICE entered detainers against them. The officers impounded the Jetta, conducted an inventory search of the Jetta, and searched the two men. The search of the Jetta revealed $4,800 in cash, $740 of which bore serial numbers used in the controlled purchases from Boatwright. It was also discovered that Mendez had three cell phones and Santamaria had two cell phones. Mendez also had the box top from a box of plastic baggies in his pants.

When officers executed the warrant at Boatwright's home, Boatwright, Cannon, and defendant Cesar Daniel Gascon-Guerrero ("Gascon-Guerrero") were present. Gascon-Guerrero was in a bathroom where officers found a small quantity of methamphetamine hidden in a dollar bill behind the toilet and a cell phone hidden atop

a cabinet. A search of the rest of home revealed five ounces of methamphetamine, four grams of marijuana, two digital scales, drug notes, surveillance cameras, two loaded handguns, and ammunition. Officers also found, in the living room of Boatwright's home, a cardboard box of plastic sandwich bags missing a box top that matched the box top found in Mendez's pants.

After agreeing to cooperate, Boatwright testified that she met defendant Isabel Ramon Rodriguez ("Rodriguez") in late 2002 and soon began selling methamphetamine that he supplied. Boatwright believed Rodriguez obtained his methamphetamine from California because she observed on at least one occasion that he traveled to California when he ran out of drugs, and when he returned, he was again able to supply methamphetamine.

In February 2003, Rodriguez was arrested in Des Moines on manslaughter charges. At that time, Boatwright owed Rodriguez money for drugs she had received from him on credit. After Rodriguez's arrest, Boatwright received phone numbers for Mendez and Santamaria through Rodriguez. The number for Santamaria did not work, but the number for Mendez was accurate. Boatwright called Mendez to tell him of the arrest, and Boatwright was present when a man that Rodriguez had brought to Iowa from California used her phone to speak with Mendez. Boatwright then maintained contact with Mendez.

Eventually, Mendez sent Santamaria to Iowa, Santamaria provided methamphetamine to Boatwright, and Boatwright sold the methamphetamine. This continued until Boatwright gambled with the proceeds of her sales and was unable to pay Santamaria and Mendez. The two men cut off Boatwright's supply for awhile, but they eventually resumed their relationship with her. On at least two occasions, Boatwright traveled to California at Mendez's request and returned from California in a black Blazer provided by Mendez. Both times, the Blazer carried methamphetamine, and Mendez sent Gascon-Guerrero with Boatwright to ensure that

the methamphetamine reached Des Moines.  Both times, Mendez and Santamaria were with Boatwright in California and traveled to Iowa separately from Boatwright and the black Blazer.  One of the trips to Iowa was the trip immediately preceding execution of the search warrant at Boatwright's home.

Ultimately, the government brought conspiracy charges against Rodriguez, Mendez, Gascon-Guerrero, Santamaria, and others.  These four defendants pleaded not guilty and proceeded to a joint trial.  Additional co-conspirators who testified at trial included DeJesus, Johnson, Carlos Gil ("Gil"), Augustin Sandoval Rodriguez, Jeffrey Robert Behle, and Philip Gatewood.  These testifying co-conspirators explained their relative roles and contacts within the conspiracy, the frequency and quantity of drugs they had personally handled, the vehicles and locations used by the conspirators, and their observations of the relationships between the conspirators.  We describe testimony from each below as relevant to the various defendants' arguments concerning the sufficiency of the evidence.  In general, the witnesses all described the conspiracy in a consistent manner: they placed Mendez at the center with Santamaria also holding a key position.  Rodriguez was a lower-level conspirator whose activities were interrupted when he was arrested on manslaughter charges.  Finally, Gascon-Guerrero's role, as described by Boatwright, was as that of a trusted shepherd sent by Mendez to ensure that shipments of drugs from California reached Iowa safely.

Mendez has been represented by several different attorneys in relation to this matter.  One of his attorneys was F. Montgomery Brown ("Attorney Brown"), who entered an appearance on October 12, 2004.  Another attorney entered an appearance to represent Mendez on October 20, 2004.  Attorney Brown moved to withdraw from the case, and the court granted his motion on November 2, 2004.  At the time of the joint trial of the four present defendants, Attorney Brown was representing Gil, and Gil testified against Mendez over the objection of Mendez's trial counsel.  Mendez argues on appeal that the alleged conflict of interest surrounding Attorney Brown's representation of Gil and Mendez in the same matter should have precluded Gil from

testifying. In particular, Mendez attacks his own trial counsel's performance alleging trial counsel should have pursued the issue of the possible conflict involving Gil and Attorney Brown more vigorously. We discuss this issue in more detail below.

Finally, the jury instructions actually given to the jury included a willful blindness instruction that did not reference any one of the four defendants in particular. There were no objections to the use of this instruction. Also, the court did not give the jury a "single vs. multiple" conspiracy instruction, and no party objected at trial to the absence of such an instruction. On appeal, Santamaria challenges the willful blindness instruction and Gascon-Guerrero challenges the absence of a single vs. multiple conspiracy instruction. We address each defendant's various arguments in turn, with additional facts presented as relevant to the arguments.

II.     Discussion

        A.     Santamaria

               1.     Santamaria:  Sufficiency of the Evidence

        Santamaria argues the evidence is insufficient to support his conviction. To the contrary, the evidence against him is very substantial. At least four witnesses testified consistently as to Santamaria's actions and role in the conspiracy. This testimony established the elements necessary to prove the conspiracy charges, and the jury accepted this testimony as credible. See Cannon, 475 F.3d at 1020 ("To convict . . . of conspiracy, the government had to prove that there was an agreement . . . that [the defendant] knew of this agreement, and that [he] intentionally joined this agreement.") (citation and internal quotation marks omitted). Further, officers stopped Santamaria leaving Boatwright's home in the red Jetta with the money from the controlled purchases and a multitude of cell phones. To the extent Santamaria bases his sufficiency-of-the-evidence challenge on the jury's assessment of the witnesses'

credibility, such determinations are "virtually unreviewable" on appeal, and we will not disturb the jury's assessment in this case. United States v. Davis, 471 F.3d 938, 948 (8th Cir. 2006) (quotation marks and internal citation omitted).

The testimony regarding Santamaria was as follows. First, Boatwright testified extensively as to her dealings with Santamaria. She identified Santamaria in court and stated that she knew him as "Rudy." She stated that, after Rodriguez was arrested for manslaughter and after she contacted Mendez, Mendez arranged for her to meet Santamaria at a restaurant in Des Moines. There, she met Santamaria for the first time and gave him money that she had owed to Rodriguez. She also testified that Rodriguez asked Mendez to supply her with methamphetamine to sell. When she talked to Mendez about obtaining drugs for sale, Mendez sent Santamaria to her home with two pounds of methamphetamine. Boatwright also testified that, after she finished selling the methamphetamine that Mendez fronted her through Santamaria, she paid to Santamaria the price quoted by Mendez. Boatwright described this scenario as a repeated event and explained that she eventually became indebted to Mendez and Santamaria because she gambled away the proceeds of her sales and failed to pay for the fronted methamphetamine. Mendez then summoned her to California where Santamaria met her at the airport, drove her to a hotel, and stayed with her until she met with Mendez. On two separate California trips, she returned to Iowa in a black Blazer accompanied by Gascon-Guerrero. Santamaria, whom she had been with in California prior to driving to Iowa, then arrived in Des Moines. Upon her return to Iowa after one trip, Boatwright met Santamaria at a Des Moines hotel. After the other trip, Santamaria and Mendez came to her home.

Boatwright's testimony places Santamaria in a pivotal role within the conspiracy, helping to coordinate the trafficking and distribution of methamphetamine between California and Iowa, traveling between the two states, and meeting with Boatwright in both states. Cruz, Johnson, and Gatewood also testified against Santamaria, describing a role for Santamaria in the conspiracy that was consistent with

Boatwright's testimony. This testimony, combined with the evidence collected from Santamaria and the red Jetta, more than suffices to support the jury's verdict.

2.      Santamaria: Willful Blindness Instruction

The court submitted a willful blindness instruction to the jury without specific reference to any one of the four defendants, and no defendant objected generally or asked that the instruction be limited. Because there was no objection or request to limit the instruction, we review only for plain error. United States v. Bamberg, 478 F.3d 934, 939 (8th Cir. 2007). "Plain error only exists if (1) there was an error, (2) the error was plain, (3) the error affected [the defendant's] substantial rights, and (4) a failure to grant relief would seriously affect the fairness, integrity, or public reputation of judicial proceedings." United States v. Falcon, 477 F.3d 573, 577 (8th Cir. 2007) (citation and internal quotation marks omitted).

The willful blindness instruction in this case was appropriate because one of Santamaria's co-defendants, Gascon-Guerrero, claimed ignorance of the conspiracy. As explained below, however, the evidence strongly demonstrated that Gascon-Guerrero would have to have been deliberately ignorant not to appreciate the existence and activities of the conspiracy. See United States v. Florez, 368 F.3d 1042, 1044 (8th Cir. 2004) ("A willful blindness instruction is appropriate when the defendant asserts a lack of guilty knowledge, but the evidence supports an inference of deliberate ignorance.") (citation and internal quotation marks omitted). Further, the government did not argue at closing that willful blindness was applicable to Santamaria. Where a willful blindness instruction is appropriate as to at least one of multiple co-defendants, we do not believe that a trial court's failure to *sua sponte* limit the willful-blindness instruction to a particular defendant generally rises to the level of plain error. Further, even if we found error on the present facts, we would not find that any such error affected Santamaria's substantial rights given the overwhelming evidence of his guilt. See United States v. Noske, 117 F.3d 1053, 1059 (8th Cir. 1997) (finding

-10-

no prejudice to a defendant in the giving of a willful blindness instruction where the instruction was appropriate as to another defendant, there was no request to limit the instruction, and the evidence against the defendant was "overwhelming").

### 3. Santamaria: Sentence Enhancement/Predicate Felonies

The district court found that Santamaria had two prior felony drug convictions and sentenced Santamaria to life imprisonment in accordance with 21 U.S.C. §§ 841(b)(1)(A) and 851. The two prior felony drug convictions were a 1991 conviction in San Jose, California, for felony possession of marijuana with intent to sell, and a 1999 conviction in Los Angeles for possession of cocaine base with intent to sell. Santamaria argues that certified records used to prove these prior convictions fail to show (1) that he was represented by, or waived his right to, counsel in relation to the 1991 conviction, or (2) that the 1999 conviction which resulted in probation rather than imprisonment was, in fact, a "final" conviction as required under 21 U.S.C. § 841(b)(1)(A).

As to the first argument, 21 U.S.C. § 851(e) places a five-year limitation on a defendant's ability to collaterally challenge a prior conviction that the government seeks to use for a federal sentencing enhancement. Id. ("No person who stands convicted of an offense under this part may challenge the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction."). This five-year limitation, however, does not apply to claims that a defendant's predicate conviction occurred in violation of the defendant's right to counsel. Custis v. United States, 511 U.S. 485, 494-96 (1994). Accordingly, even though the 1991 conviction was more than five

-11-

years old, Santamaria is not time-barred from proving it infirm for use as predicate felony.[2]

Santamaria's challenge fails, instead, because he did not meet his burden of proof. Congress clearly provided that a defendant may challenge a prior conviction as "obtained in violation of the Constitution of the United States," but Congress chose to place on the defendant rather than the government "the burden of proof by a preponderance of the evidence on any issue of fact raised [in the challenge]." 21 U.S.C. § 851(c)(2). Santamaria was careful below, in his appellate brief, and in oral argument to this panel, to avoid actually claiming that he was deprived of counsel in 1991. Rather, he argues only that the certified record of his conviction fails to show that he was represented by counsel or that he waived his right to counsel. In fact, his argument on this issue in his brief concludes, "*If* Santamaria was not represented by counsel for the subject offense, the offense cannot be used to trigger the mandatory life sentence." (Emphasis added). Santamaria's reluctance to actually claim there was an absence of counsel in 1991 strongly suggests that this argument amounts to form over substance. In any event, a complete failure to allege the absence of counsel falls far short of meeting the factual burden of proof imposed on Santamaria by § 851(c)(2).

As to the 1999 conviction, Santamaria argues there was no final judgment under state law because he received probation and a suspended sentence. As a result, he argues, there was no "prior conviction[] for a felony drug offense." 21 U.S.C. § 841(b)(1)(A). The facts surrounding the California proceedings were as follows. Santamaria pleaded guilty to the California cocaine charge on June 14, 1999, and was sentenced to thirty-six months of probation and ninety days of imprisonment. On

---

[2]As to the 1999 conviction, Santamaria does not present a collateral challenge. Rather, he contests the very existence of a qualifying final conviction. Accordingly, the five year limitation does not apply.

October 10, 2001, his probation was modified and he was ordered to complete 80 hours of community service. On July 10, 2002, his probation was revoked, and on July 14, 2002, he was arrested on a bench warrant and ordered to attend an anger management meeting. On August 26, 2002, the court reinstated his probation. Based on these facts, we believe that Santamaria's 1999 guilty plea and subsequent proceedings in California qualify as a final conviction under § 841(b)(1)(A). See United States v. Slicer, 361 F.3d 1085, 1086-87 (8th Cir. 2004) (applying federal law to find that probation and a state's suspended imposition of sentence qualified as a final conviction under § 841(b)(1)(A)); United States v. Maxon, 339 F.3d 656, 658-59 (8th Cir. 2003) (applying federal law to determine whether there was a qualifying predicate); United States v. Franklin, 250 F.3d 653, 665 (8th Cir. 2001) (same); United States v. Ortega, 150 F.3d 937, 948 (8th Cir. 1998) (stating that federal rather than state law determines whether a prior proceeding resulted in a qualifying predicate under § 841(b)(1)(A)).

In a separate challenge also related to sentencing, Santamaria argues that the district court impermissibly looked beyond the statutory elements of his prior convictions to determine that the underlying crimes were "felony drug offense[s]." 21 U.S.C. § 841(b)(1)(A). This argument is without merit. Here, the information necessary to determine the nature of the predicate offenses was contained in the certified records of the convictions. Under Shepard v. United States, 544 U.S. 13 (2005), a sentencing court is not constrained to look only at the statutory elements of the offense, but may look to the "terms of the charging document, the terms of a plea agreement or transcript of colloquy between the judge and defendant . . . or to some comparable judicial record of this information." Id. at 26. The district court in this case simply undertook no impermissible inquiries in the course of determining that Santamaria's prior convictions for possessing marijuana with the intent to sell and possessing cocaine base with the intent to sell were qualifying prior "felony drug offense[s]." 21 U.S.C. § 841(b)(1)(A).

-13-

B.    Gascon-Guerrero

1.    Gascon-Guerrero:  Sufficiency of the Evidence

Gascon-Guerrero challenges the sufficiency of the evidence to support his conviction.  In particular, he argues that the evidence proved merely that he was present, not that he had knowledge of, or participated in, a conspiracy.  His arguments are without merit.

Gascon-Guerrero was arrested when found in the bathroom of Boatwright's residence during the officers' execution of the search warrant.  Hidden with him in the bathroom were a cell phone and small quantity of methamphetamine wrapped in a dollar bill.  Boatwright testified that Mendez sent Gascon-Guerrero along to accompany her on two separate trips from California to Iowa to make sure she and the drugs that were hidden in the Blazer arrived safely.  Upon arriving in Iowa on the first trip, Gascon-Guerrero waited with Boatwright until instructed to meet with Santamaria at a Des Moines-area motel. He then took the Blazer and Boatwright to the motel to meet with Santamaria.  Later, he drove the Blazer and Boatwright back to Boatwright's residence, left again with the Blazer, and returned a short time later with two pounds of methamphetamine for Boatwright to sell.  Following the second California-to-Iowa trip that Gascon-Guerrero took with Boatwright, Mendez and Santamaria took the Blazer from Boatwright's home while Boatwright and Gascon-Guerrero waited.  Mendez and Santamaria returned shortly thereafter with 1/4 pound of high purity "ice" methamphetamine and 1/4 pound of lower purity Mexican methamphetamine.

The nature of Gascon-Guerrero's actions, as described by Boatwright and as corroborated by Gascon-Guerrero's presence at the residence with the hidden phone and methamphetamine when officers executed the search warrant, provide sufficient support for the jury's determination.

2. Gascon-Guerrero: Multiple Conspiracy/Single Conspiracy Instruction

Gascon-Guerrero challenges the district court's failure to offer a "single conspiracy vs. multiple conspiracy" jury instruction. Gascon-Guerrero neither requested such an instruction nor objected to its absence, so our review is for plain error. Bamberg, 478 F.3d at 939. Here, there was no error in the absence of such an instruction.

We have said that:

A single conspiracy is composed of individuals sharing common purposes or objectives under one general agreement. A single conspiracy may exist even if the participants and their activities change over time, and even if many participants are unaware of, or uninvolved in, some of the transactions. Further, the agreement need not be explicit, but may be tacit, based upon the actions of the defendant.

United States v. Smith, 450 F.3d 856, 860 (8th Cir. 2006) (internal citations and quotation marks omitted). The government's theory of the case was that Mendez and Santamaria were at the center of a single, "wheel and spoke" conspiracy to distribute methamphetamine with the other co-conspirators involved to varying degrees in different aspects of the transportation, delivery, and sale of the drugs. The evidence presented against Gascon-Guerrero consistently described a conspiracy to deliver and distribute methamphetamine from California to the Des Moines area. In United States v. Cubillos, 474 F.3d 1114, 1118 (8th Cir. 2007), we stated that to determine whether there is one or more conspiracies, "we consider factors such as 'the nature of the activities, the location where the alleged events of the conspiracy occurred, the identity of the coconspirators, and the time frame.'" Id. (quoting United States v. Burns, 432 F.3d 856, 863 (8th Cir. 2005)). Here, there were no allegations of a separate conspiracy with a separate purpose, separate activities, or separate locations,

and the evidence supported the government's single conspiracy theory. It is not necessary that all co-conspirators know one another or collaborate with every other member of a conspiracy for there to be a single conspiracy. See United States v, Oseby,148 F.3d 1016, 1024 (8th Cir. 1998) ("'[I]t is not necessary to show that all the conspirators were involved in each transaction or that all the conspirators even knew each other.'") (quoting United States v. Rosnow, 977 F.2d 399, 405 (8th Cir.1992)).

3.      Gascon-Guerrero: Ineffective Assistance of Counsel

Gascon-Guerrero's trial counsel decided not to cross-examine Boatwright, and Gascon-Guerrero alleges ineffective assistance of counsel based on this decision. We note initially that defense counsel for the other defendants cross-examined Boatwright and brought issues relevant to her credibility to light for the jury. Gascon-Guerrero does not suggest that cross-examination by the other attorneys was flawed or ineffective or that there were additional areas of inquiry his own counsel could have or should have pursued. Gascon-Guerrero also does not explain how he was differently situated from the other defendants for the purpose of attacking Boatwright's credibility in a manner that would have been unique to Gascon-Guerrero's case. That having been said, a claim of ineffective assistance is not generally cognizable on direct appeal unless the record relevant to the claim of ineffectiveness is fully developed "or where the result would otherwise be a plain miscarriage of justice." United States v. Lewis, 483 F.3d 871, 873 n.2 (8th Cir. 2007) (internal quotation marks and citation omitted). No record has been developed in this case to explain how the alleged ineffectiveness might have caused prejudice to Gascon-Guerrero, we find no risk of a miscarriage of justice, and Gascon-Guerrero largely appears to have raised this issue to ensure its preservation for a collateral attack. As such, we will not address this issue further.

4.    Gascon-Guerrero:  Drug Quantity Determination

The district court found Gascon-Guerrero responsible for at least fifteen kilograms (slightly over thirty-three pounds) of methamphetamine and sentenced him to 200 months' imprisonment to be followed by 60 months of supervised release.  As a conspirator, Gascon-Guerrero is responsible for the quantity of drugs involved in the conspiracy that was reasonably foreseeable in light of his agreement to participate in the conspiracy:

> In order to attribute a quantity of drugs to a defendant, the sentencing court is required to find by a preponderance of the evidence that the activity involving those drugs was in furtherance of the conspiracy and either known to that defendant or reasonably foreseeable to him.  In a drug conspiracy case, the district court may consider amounts from drug transactions in which the defendant was not directly involved if those dealings were part of the same course of conduct or scheme.

United States v. Rodriguez, 484 F.3d 1006, 1014 (8th Cir. 2007) (quotation marks and internal citations omitted).  Given this rule, it matters not that only a small quantity of methamphetamine was found with Gascon-Guerrero in the bathroom when officers executed the search warrant.

Gascon-Guerrero was well positioned within the conspiracy to appreciate the scope of the conspiracy and the quantities involved.  He was shown to be a trusted shepherd who could be relied upon to ensure other conspirators made it securely to their destinations.  He was neither a one-time mule nor an ignorant patsy.  Regarding activities directly involving Gascon-Guerrero, there were repeated trips between California and Iowa with Boatwright.  In Iowa, Gascon-Guerrero left Boatwright's residence with Santamaria in the Blazer and returned with drugs.  It is reasonable to presume, as Boatwright presumed, that Gascon-Guerrero and Santamaria extracted the drugs from their hiding place in the Blazer.  These actions demonstrate a position

within the conspiracy with adequate exposure to information about the conspiracy to make more than Gascon-Guerrero's own activities reasonably foreseeable to Gascon-Guerrero.

Other co-conspirators, including Cruz and Johnson, testified consistently as to the quantities involved in their own cross-country trips (fifteen to twenty-five pounds per trip for five trips). In addition, Jeff Behle and Philip Gatewood were testifying co-conspirators who claimed to have been involved with the breaking-down of vehicles and extraction of drugs from transport vehicles. These co-conspirators testified consistently as to repeated shipments in the same weight range. Although much of this testimony described shipments in a time frame preceding the evidence of Gascon-Guerrero's involvement, the testimony clearly demonstrates shipment size and transportation techniques consistent with Boatwright's testimony. The witnesses' testimony, taken together, is adequate to show that the conspiracy involved at least fifteen kilograms and that this quantity was reasonably foreseeable to Gascon-Guerrero.

C.   Rodriguez

Rodriguez argues only that the evidence was insufficient to support his conviction. For the reasons explained above, including Boatwright's testimony regarding Rodriguez's role in the conspiracy and his role in introducing her to Mendez and facilitating her receipt of drugs from Mendez and Santamaria, his arguments are without merit. The evidence was more than sufficient to support the jury's verdict as to Rodriguez.

D.    Mendez

1.    Mendez: Reasonableness of the <u>Terry</u> Stop/Seizure

Mendez first challenges the officers' stop of the red Jetta.  Mendez argues the stop was based solely on race and, as such, was unreasonable and in violation of his Fourth Amendment protections against an unreasonable seizure.[3]

Regarding the initial stop, we find that there was reasonable suspicion for an investigatory stop as required under <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968).  <u>See</u> <u>United States v. Bell</u>, 480 F.3d 860, 863 (8th Cir. 2007) (applying the <u>Terry</u> standard of reasonable suspicion to an investigatory traffic stop where the officer possessed information from a reliable informant's tip and where a detective had verified portions of the tip through surveillance prior to the stop).  In claiming that the stop was based solely on race, Mendez mischaracterizes the scope of the information underlying the officers' reasonable suspicion.  Officers possessed all the information that supported the issuance of the search warrant for Boatwright's residence, including the repeated controlled purchases, Boatwright's purchase of luggage and round-trip travel to California, and the claim by the confidential informant that Boatwright had returned from California with a Hispanic male believed to be her supplier.  Armed with this information, officers surveilled Boatwright's home, observed a Hispanic male on the front porch, and observed that man and another Hispanic male leave the residence in the red Jetta.  Based on the totality of this information, it cannot be said that officers stopped the red Jetta merely because a Hispanic person was present, nor can it be said

---

[3]Mendez appears to challenge only the initial, investigatory stop, not the expansion or duration of the stop.  In fact, any such challenge would be wholly without merit because suspicion of criminal activity grew rapidly from the initial stop and because Mendez consented to the officer's request to move the investigation to a police station.  <u>See</u> <u>United States v. Gomez Serena</u>, 368 F.3d 1037, 1041 (8th Cir. 2004) (holding that the expansion or extension of stop may be permissible if supported by developing or expanding level of suspicion).

that the officers lacked reasonable suspicion. Although race was an identifying characteristic actually used by the officers, it was not the only factor officers relied upon, and the present case is not an example of racial profiling, as suggested by Mendez. See United States v. Thomas, 480 F.3d 878, 882 (8th Cir. 2007).

### 2. Conflict of Interest Regarding Attorney Brown

When the government offered Gil as a witness and commenced direct examination, Mendez's actual trial counsel, Timothy McCarthy ("Attorney McCarthy"), objected at a sidebar. Attorney McCarthy challenged the use of Gil as a witness, alleging that Attorney Brown's temporary, pre-trial representation of Mendez, coupled with Attorney Brown's representation of Gil, created a conflict of interest. The court determined during the sidebar that Gil could testify, subject to possible exclusion, and that a record would be made after-the-fact to address the possible conflict.

In direct testimony and on cross-examination, Gil explained that he pleaded guilty to conspiracy to distribute methamphetamine without a written plea agreement. He had been sentenced to the statutory minimum for his offenses, 120 months' imprisonment, and was already serving his sentence by the time of Mendez's trial. Gil testified that he met Mendez in a Des Moines-area bar, began receiving one to two pound packages of methamphetamine from Mendez, always met with Mendez on the east side of Des Moines, saw Mendez in a black Mercedes but in no other vehicles, and received the methamphetamine on credit with money due to Mendez after resale of the drugs. Gil testified that he sold methamphetamine from Mendez for a three to four month period after Christmas 2003.

When Gil was done testifying and the jury was excused for a break, Attorney McCarthy was given the opportunity to question Gil. Attorney McCarthy quickly focused on the interaction between Attorney Brown and Gil and asked Gil if he was

willing to waive his attorney-client privilege and discuss information exchanged with Attorney Brown. Attorney McCarthy explained to the district court that the potential for prejudice to Mendez in this situation was the possibility that Attorney Brown had obtained privileged, damaging information from Mendez and subsequently breached his duty of confidentiality towards Mendez by sharing that information with Gil for use in Gil's testimony against Mendez. Attorney McCarthy, the prosecutors, and the district court agreed that any further questioning along these lines and any waiver of privilege by Gil could not take place without the presence of Attorney Brown and without giving Gil the opportunity to discuss the possible waiver with Attorney Brown. As a result, the district court decided to halt the offer of proof related to Gil and resume at a later date when Attorney Brown could be made to appear.

At the appointed date and time, when the court asked Attorney McCarthy if he wished to resume questioning Gil outside of the presence of the jury, the following exchange took place:

> THE COURT: Mr. McCarthy, my understanding was you didn't need to make any record with respect to either Mr. Brown or Mr. Gil, is that correct?

> MR. McCARTHY: That is correct, Your Honor. I'm going to let the Carlos Gil issue go at this time.

Later, in a motion for new trial, Mendez argued that Attorney McCarthy provided ineffective assistance by failing to make a proper record regarding the possible conflict involving Attorney Brown's representation of Mendez and Gil. Mendez argued that Attorney Brown's dual representation presented an actual conflict of interest and required relief without a need to show prejudice. The district court rejected Mendez's arguments, finding that it was necessary to prove prejudice under Strickland v. Washington, 466 U.S. 668, 692 (1984), and that the presumed prejudice rule of Cuyler v. Sullivan, 446 U.S. 335, 349 (1980) (holding that a showing of

Strickland-type prejudice is not required where a defendant demonstrates an actual conflict that adversely affected counsel's performance), did not apply because there was no actual conflict of interest. The district court's finding was based on the fact that Mendez's own trial counsel, Attorney McCarthy, was not alleged to have labored under any sort of conflict. Rather, the conflict related to Attorney Brown. Because the presumed prejudice standard did not apply, relief was contingent upon a showing of prejudice. As to the issue of prejudice, the district court ultimately concluded, "[a]s shown by the . . . evidence . . . even if the Court disallowed Gil's testimony, there is no reasonable probability the jury verdict would have been different in this case."

On appeal, Mendez renews his conflict of interest argument, placing it in the context of an ineffective assistance argument directed towards Attorney McCarthy. Although, we generally do not address such claims on direct appeal, Lewis, 483 F.3d at 873 n.2, we find no further development of the record is necessary in this case to resolve Mendez's claim of ineffective assistance. Accordingly, we will address this claim now, on direct appeal. In doing so, we affirm for the same reasons as the district court, namely: (1) there was no actual conflict; (2) a showing of prejudice is therefore necessary for any grant of relief; and (3) there was no prejudice in this case because the evidence against Mendez was overwhelming and Gil was, at most, a minor witness whose testimony was cumulative with that of more important witnesses.

There was no actual conflict in this case because Mendez received conflict-free assistance from Attorney McCarthy. Mendez cites no authority, and we have found none, in which the presumed prejudice rule of Cuyler is extended to a situation involving a defendant's prior attorney in the absence of any alleged conflict involving actual trial counsel. There is, however, authority from another circuit that is analogous to the present situation and that strongly suggests a showing of prejudice is required in Mendez's case. In English v. United States, 620 F.2d 150, 151-52 (7th Cir. 1980), the Seventh Circuit gave short shrift to an argument similar to Mendez's. There, a defendant initially was represented by two attorneys, counsel and co-counsel.

Co-counsel ceased the representation and began representation of a co-defendant. The defendant claimed a conflict based on the fact that co-counsel, who had actually represented him in the same proceedings, switched and served the co-defendant. The Seventh Circuit summarily dismissed the claim, finding that because the defendant received conflict-free assistance from his own, actual trial counsel, any actions taken by former co-counsel could not create a conflict. See id. at 151 ("English after all is not impugning the effectiveness of his own counsel . . . but his former counsel. . . .").

This is not a case like Simmons v. Lockhart, 915 F.2d 372 (8th Cir. 1990), in which our court found an actual conflict and applied the Cuyler standard to examine whether there was "an actual and demonstrable effect of the conflict . . . not merely an abstract or theoretical one." Simmons, 915 F.2d at 378. In Simmons, a defendant's actual trial counsel had previously represented one of the prosecution's witnesses. There, we stated that the actual conflict "fairly leaps off the page." Id. at 377. We held, however, that it remained necessary to show "how [the] defense [was] hurt by the fact that one of his trial lawyers had previously represented the witness [involved in the alleged conflict.]" Id. at 378. We carefully reviewed the record of the trial and determined that the attorney who labored under an actual conflict had made no tactical decisions nor performed in any manner that suggested the conflict impaired the defense. Id.

The present case, in contrast, involves absolutely no showing or suggestion of a conflict on the part of the one attorney who actually represented Mendez at trial and made all tactical decisions for Mendez at trial. As such, we conclude that the presumed prejudice standard of Cuyler has no application to the present facts. Rather, the traditional prejudice inquiry of Strickland applies, and it is necessary for Mendez to "demonstrate a reasonable probability" that the outcome of the proceedings would have been different absent some ineffectiveness on the part of Attorney McCarthy. Strickland, 466 U.S. at 694.

Here, as Mendez has consistently asserted to the district court and to our court, the possibility of prejudice lies in the abstract possibility that Attorney Brown might have obtained damaging privileged information from Mendez and the further abstract possibility that Attorney Brown might have passed this information on to Gil. Mendez argues Attorney McCarthy provided ineffective assistance by ceasing his pursuit of this issue and that Attorney McCarthy's ineffectiveness caused prejudice. We disagree. We find that it was well within the bounds of professional judgment and discretion for Attorney McCarthy to elect to stop his pursuit of this abstract chain of potential prejudice, and as such, we find no ineffectiveness on McCarthy's part. The evidence against Mendez was overwhelming: six cooperating co-conspirators other than Gil testified consistently as to Mendez's role at the heart of the conspiracy. Four inmates who had been confined with Mendez testified as to statements Mendez made about his involvement with methamphetamine trafficking. In addition, Mendez was stopped leaving Boatwright's home shortly before execution of the search warrant, and he was in the car that carried money used in the controlled buy. Further, he carried in his pocket the box top from a box of baggies that was found in the Boatwright residence with other drug paraphernalia. Finally, Mendez himself testified and made many statements that a reasonable jury could disbelieve and which could permit the jury to conclude Mendez was dissembling to cover his guilt. Given this state of the record, we believe that Mendez has not satisfied either element of the Strickland test. Not only did Mendez fail to show a level of prejudice that could satisfy the "reasonable probability" standard of Strickland, he failed to show that Attorney McCarthy performed in a deficient manner when deciding to let the conflict issue go and cease his questioning of Gil.

3.    Denial of the Motion for a New Trial

Mendez's motion for a new trial was based on his arguments concerning the Terry stop and the alleged conflict.  Given our resolution of these issues, we find no error in the district court's denial of the motion for a new trial.

For the foregoing reasons, the judgment of the district court is affirmed.

_____