# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2883

_____

United States of America,          *
                                   *
         Appellee,                 *
                                   *     Appeal from the United States
    v.                             *     District Court for the
                                   *     Western District of Missouri.
Marzett L. Parker,                 *
                                   *
         Appellant.                *

_____

Submitted:  April 14, 2009
Filed:  October 16, 2009

_____

Before RILEY, BENTON, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Marzett L. Parker appeals the district court's[1] denial of his motion to suppress evidence obtained during a vehicle search, motion for a continuance or exclusion of identification evidence, and motion for acquittal.  For the reasons set forth below, we affirm.

_____

[1]The Honorable Richard E. Dorr, United States District Judge for the Western District of Missouri.

I.

On March 30, 2006, at approximately 8:00 p.m., T.E. Wilkins, a Missouri State Highway Patrol Commercial Motor Vehicle officer, performed a random check[2] on a truck after it crossed the scales of the Newton County, Missouri, weigh station. Parker was the driver of the truck, which was pulling a trailer containing three vehicles: a 2001 Ford Excursion, a 1995 Nissan Quest, and a 2000 Chevrolet Silverado. The truck had California license plates and bore the company name "P.B. Auto Transport, Inc." Officer Wilkins conducted a Level 1 inspection—a review of Parker's logbook, bills of lading, insurance, and license—pursuant to his authority under the North American Standard Inspection Program's (NASIP)[3] inspection regulations. See Commercial Vehicle Safety Alliance, North American Standard Inspection Levels, http://www.cvsa.org/programs/nas_levels.aspx (last visited Oct. 5, 2009); see also 49 C.F.R. § 350.105.

---

[2]The Commercial Vehicle Safety Alliance authorizes officers such as Officer Wilkins to enforce federal motor vehicle laws by checking licenses, logbooks, insurance, etc. See Commercial Vehicle Safety Alliance, North American Standard Inspection Levels [hereinafter NAISP Levels], http://www.cvsa.org/ programs/nas_levels.aspx (last visited Oct. 5, 2009); see also 49 C.F.R. § 350.105.

[3]The NASIP is:

[T]he methodology used by State [Commercial Motor Vehicle (CMV)] safety inspectors to conduct safety inspections of CMVs. This consists of various levels of inspection of the vehicle or driver or both. The inspection criteria are developed . . . [in conjunction with] the Commercial Vehicle Safety Alliance (CVSA), an association of States, Canadian Provinces, and Mexico whose members agree to adopt these standards for inspecting CMVs in their jurisdiction.

49 C.F.R. § 350.105.

Although Parker was the registered owner of both the truck and the trailer, he was not the registered owner of any of the vehicles he was transporting. Parker had a current International Fuel Tax Agreement, yet his commercial license was expired. Officer Wilkins also discovered that Parker's logbook was not up to date, and the last entry was dated March 28, 2006, two days prior to the stop. Therefore, the logbook did not comply with regulatory standards requiring accurate and updated records of driving activity.[4] Officer Wilkins provided Parker an opportunity to update his logbook and made copies of Parker's log sheets. Officer Wilkins asked if Parker had a co-driver, and Parker identified Odell Edwards, who was also in the truck.

Further into the stop, Officer Wilkins discovered discrepancies between Parker's statements and his updated logbook. Parker's bills of lading for the vehicles indicated he picked up the vehicles between March 14 and 20, 2006, yet his logbook indicated he did not leave on this trip from California until March 28, 2006. Parker told Officer Wilkins that he was in a hurry to deliver the vehicles because people were waiting on him, and that because of this rush, he had a hard time keeping up with his logbooks. However, Officer Wilkins became suspicious of these statements given the eight-day gap between Parker's initial pick up of the vehicles and when he began the trip.

The discrepancy in Parker's statements and his out-of-date logbook led Officer Wilkins to conduct a NASIP Level II walk-around inspection[5] of Parker's truck. Officer Wilkins looked through a window of the Ford Excursion and observed a large

---

[4]"The daily log has a safety purpose and is used to check whether a driver is abiding by federally mandated rules limiting the number of hours a driver can operate a commercial motor vehicle without rest." United States v. Knight, 306 F.3d 534, 538 (8th Cir. 2002) (Murphy, J., dissenting).

[5]A Level II walk-around inspection includes inspection of "only those items, which can be inspected without physically getting under the vehicle." See NAISP Levels, http://www.cvsa.org/programs/nas_levels.aspx (last visited Oct. 5, 2009).

cardboard box in the back seat of the vehicle. Based on his experience, Officer Wilkins thought the box suspicious as it was unusual for a transported vehicle to contain items inside. The suspicious box, coupled with the discrepancy between Parker's logbooks and statements, caused Officer Wilkins and his supervisor, Officer Michael Lee, to contact a Missouri highway trooper for a further investigation.

Officer Wilkins again requested that Parker update his logbook, yet Parker continued to write down inaccurate information, including filling out the logbook for times in the future. In the meantime, the officers discovered that Edwards, the co-driver, had a suspended license. Officer Wilkins issued a citation to Parker for his inaccurate logbooks, and took his truck out of service for ten hours.[6] Although Parker was not allowed to drive his truck or any other commercial vehicle while his truck was taken out of service, the officers did not force Parker to remain at the weigh station and he was free to leave by any other means.

_____

[6]Taking a vehicle out of service is a procedure authorized under the NASIP that will deny a driver with inaccurate records the ability to drive a commercial vehicle for certain amount of time. 49 C.F.R. § 395.13(d)(2). The regulation reads:

> Every special agent of the Federal Motor Carrier Safety Administration . . . is authorized to declare a driver out of service and to notify the motor carrier of that declaration, upon finding at the time and place of examination that the driver has violated the out of service criteria as set forth in [the following:] . . . No [commercial motor vehicle] driver required to maintain a record of duty status under § 395.8 . . . shall fail to have a record of duty status current on the day of examination and for the prior seven consecutive days . . . [, however] a driver failing only to have possession of a record of duty status current on the day of examination and the prior day, but has completed records of duty status up to that time (previous 6 days), will be given the opportunity to make the duty status record current.

Id. § 395.13(a)-(b).

At approximately 10:00 p.m., two hours after the initial stop, Troopers Thomas Mitchell and Terry Moreland of the Missouri State Highway Patrol arrived at the scene and questioned both Edwards and Parker. Edwards indicated that they were hauling vehicles from Fontana, California, to Ohio and Pennsylvania for the vehicle's owners. Parker gave the same shipment information, but he indicated that the vehicles were auction vehicles. Parker also stated that the week-long gap between first picking up the vehicles and leaving California was due to personal problems. When questioned about the box in the Ford Excursion, Parker denied knowledge of its presence. After a criminal history check, it was discovered that both Parker and Edwards had prior criminal convictions.

Upon Trooper Mitchell's inquiry, Parker gave his verbal consent to search the three vehicles he was hauling, providing Trooper Mitchell with the keys to each. After opening the door to the Ford Excursion, Trooper Mitchell noticed a strong chemical odor and multiple air fresheners. Because he was unfamiliar with the odor, Trooper Mitchell contacted the Newton County Sheriff's Office for assistance. The office's canine unit arrived and the dog alerted to the presence of narcotics in both the Ford Excursion and the Nissan Quest. Trooper Mitchell found two boxes in the Excursion labeled "Consolidated Can Products," inside of which he discovered a total of 40 one-gallon cans labeled "March 25, 2006." The cans contained a quantity of phencyclidine (PCP) with a combined street value of $4 million. Once Officer Mitchell discovered the cans, Parker again changed his story regarding his travel schedule, claiming that he had not actually picked up the Ford Excursion until March 27 or 28, 2006. During the search of the Nissan Quest, Trooper Mitchell became suspicious of an insert he discovered in the glove compartment. After pulling the insert, he found twelve kilograms of cocaine, with a street value of $1.2 million.

Trooper Moreland immediately arrested Parker and Edwards and read them their <u>Miranda</u>[7] rights. Edwards and Parker were then taken to the Newton County Sheriff's Department and the vehicles were towed for further inspection. On April 4, 2006, DEA Special Agent Sean Henry searched the truck and the three vehicles again, pursuant to a valid search warrant. Agent Henry discovered additional log sheets, various paperwork, bills of lading, receipts that tracked when Parker had actually picked up the vehicles and started his trip, and several documents containing the name "Alphonso Foster." Agent Henry also found five cell phones, one of which was owned by a "Herman Michelle," and two of which had been contacted by a Kim Walker.

On April 20, 2006, Parker and Edwards were indicted for possession with intent to distribute one kilogram or more of PCP, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(iv), and possession with intent to distribute five kilograms or more of a detectable amount of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii)(II). Parker filed a motion to suppress evidence seized from the vehicle search, and an evidentiary hearing was held before a United States Magistrate Judge.[8]

On August 14, 2007, the magistrate judge issued a Report and Recommendation ("R&R"), recommending denial of the motion to suppress. On November 9, 2007, the district court adopted the R&R and denied the motion to suppress. On December 13, 2007, a federal grand jury issued a superceding indictment, adding two defendants—Kim Walker and Alphonso Foster—and an additional charge of conspiracy to distribute in excess of one kilogram of PCP, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(IV). This added charge was based on a large PCP production and distribution conspiracy which law enforcement had discovered.

---

[7]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

[8]The Honorable James C. England, United States Magistrate Judge for the Western District of Missouri.

During the jury trial, Cindon Young testified that he was a PCP dealer and an associate of Walker and Foster, both of whom he claimed were PCP manufacturers. Young stated that he had been involved in a plan to transport PCP from California to Philadelphia, where it would then be distributed. Young also testified that Walker and Foster manufactured the PCP and then planned to send the PCP to Philadelphia on a truck driven by a driver named "Herm." Young testified that he had met Herm through Walker, and identified Parker as Herm. The PCP was to be delivered to Armando Mines, who would in turn sell it in Philadelphia with Young's help. Mines testified that in 2004, he had met with Young and "Plex" in Los Angeles, to discuss a plan to transport PCP to Philadelphia for Mines to later distribute. Mines identified the Plex he met in Los Angeles as Walker. Mines stated that he eventually agreed to participate in the PCP distribution scheme.

Following the trial, on February 27, 2008, the jury convicted Parker on all three charges. The court sentenced Parker to three concurrent 324-month sentences. Edwards, however, was acquitted.

## II.

Parker claims that the district court erred in denying his motion to suppress, arguing that because he was illegally detained when he consented to the search of the transported vehicles, such consent was involuntary. "[W]hen reviewing a district court's denial of a suppression motion, we review for clear error the court's factual findings and review de novo whether the Fourth Amendment was violated." United States v. Rodriguez, 484 F.3d 1006, 1010 (8th Cir.), cert. denied, 128 S. Ct. 316 (2007). We find that the district court did not err in finding there was no Fourth Amendment violation because the stop was properly administered under the authority of the Missouri State Highway Patrol, and Parker was not unlawfully detained when he consented to the search.

"The Fourth Amendment protects individuals against unreasonable searches and seizures by the government." United States v. Williams, 521 F.3d 902, 905 (8th Cir. 2008). The government must obtain a warrant before searching an area where an individual has a reasonable expectation of privacy. United States v. Madrid, 152 F.3d 1034, 1037 (8th Cir. 1998). It is clearly established that one exception to the Fourth Amendment's search warrant requirement is voluntary consent to a search. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). Parker claims his consent was involuntary because he gave it while unlawfully detained. We disagree.

The Supreme Court has held that "'closely regulated' industr[ies] ha[ve] a reduced expectation of privacy." New York v. Burger, 482 U.S. 691, 702 (1987). Therefore, closely regulated industries may be subject to warrantless searches of property, if "the rules governing the search offer an adequate substitute for the fourth amendment warrant requirement." United States v. Knight, 306 F.3d 534, 535 (8th Cir. 2002). To qualify as a valid substitute, the rules governing the search must first provide adequate notice by being "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." Burger, 482 U.S. at 703 (quotation omitted). Second, the rules must limit the discretion of inspecting officers "in time, place, and scope." Id. (quotation omitted). This court has held that commercial trucking is considered one of these "closely regulated" areas. See Knight, 306 F.3d at 535. Additionally, we have recognized that the NASIP procedures provide both the adequate notice and limited discretion required under the Burger analysis. Id.

Missouri law requires all commercial vehicles, except those licensed for less than 1800 pounds, to stop at weigh stations. Mo. Rev. St. § 304.235. Additionally, Missouri allows the State Highway Patrol to adopt NASIP procedures for taking a vehicle out of service. Mo. Rev. St. § 307.400(3) ("Criteria used for placing vehicles and drivers out of service are the North American Uniform Out-of-Service Criteria adopted by the Commercial Vehicle Safety Alliance . . . ."). Therefore, once a

commercial vehicle stops at a weigh station, Missouri State Highway Patrol officers may conduct inspections and implement procedures authorized by the NASIP.

It is undisputed that Officer Wilkins and Officer Lee followed the authorized NASIP procedures in inspecting the truck, trailer, and cargo, and in reaching the decision to take the truck out of service for ten hours. Moreover, although Parker was not allowed to drive a commercial vehicle when his was taken out of service, Parker was free to leave by any other means. Therefore, Parker was not unlawfully detained when he verbally consented to the search of all the vehicles and gave the keys to Officer Mitchell. Because he was not detained when he consented, the search was pursuant to voluntary consent.

## III.

Parker claims that the district court erred by denying his pretrial motion to exclude Young's additional testimony—which identified Parker as Herm—and by denying Parker's alternative motion for a continuance. Parker asserts that this identification testimony was the only evidence linking him to the conspiracy, and that he received notice of the identification only one day before the trial was scheduled to begin. We review evidentiary rulings and the denial of a motion for continuance for abuse of discretion. See United States v. Arias, 252 F.3d 973, 977 (8th Cir. 2001) (evidentiary rulings); United States v. Controneo, 89 F.3d 510, 514 (8th Cir. 1996) (denial of motion for continuance). Further, when reviewing the denial of a motion for continuance, this court looks to several factors to determine if there was an abuse of discretion, including "the amount of time granted for preparation, the conduct of counsel at trial, and whether prejudice appears from the record." United States v. Campbell, 609 F.2d 922, 925 (8th Cir. 1979). Additionally, "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Ungar v. Sarafite, 376 U.S. 575, 589 (1964).

In this case, the government notified Parker's attorney upon learning that Young had identified a photograph of Parker as Herm and would so testify and Parker offers no authority for the proposition that he should or could have been provided with earlier notice. Further, Parker knew well in advance of trial that Young was going to testify and that he would state that Herm was the conspiracy's driver. He also knew that a cell phone owned by Herman Michelle had been found in Young's possession by law enforcement officers and that the cell phone had been contacted by Kim Walker. Although Parker contends that notice of the photograph identification testimony was not received until February 19, 2008—one day before the trial was scheduled to begin—he was provided with an additional five days to consider, investigate and respond to this testimony when the trial was postponed for five days due to a major snow storm. Finally, Young was afforded a full opportunity to cross-examine Young. We find that the district court did not abuse its discretion in denying a continuance and in allowing Young's identification testimony.

IV.

Finally, Parker contends that the district court erred in denying his motion for judgment of acquittal because the evidence presented at trial was insufficient to support a conviction for either the conspiracy or possession with intent to distribute charges. "We review de novo a district court's denial of a motion for judgment of acquittal." United States v. Cannon, 475 F.3d 1013, 1020 (8th Cir.), cert. denied, 128 S. Ct. 365 (2007). We look to see if "the evidence presented at trial was insufficient to sustain a conviction," United States v. Engler, 521 F.3d 965, 973 (8th Cir. 2008), by reviewing the evidence "in the light most favorable to the government[,]" United States v. Pace, 922 F.2d 451, 452 (8th Cir. 1990). We "giv[e] the government the benefit of all reasonable inferences from that evidence[.]" Id. Although we may not again weigh the evidence presented at trial, it is our task to determine if "there [is] enough evidence in this record that could support a guilty verdict . . . ." Id. Here, after reviewing the evidence in the light most favorable to the government, we find that the evidence supports all three convictions.

First, to establish the existence of a conspiracy, the government has the burden of proving that "there was a conspiracy with an illegal purpose, that the defendant was aware of the conspiracy . . . [,] that he knowingly became a part of it[,]" and that he "entered into an agreement with at least one other person and that the agreement had as its objective a violation of law." United States v. Fitz, 317 F.3d 878, 881 (8th Cir. 2003). Existence of the agreement can be established through circumstantial evidence, and can be inferred through the parties' actions. United States v. Shoffner, 71 F.3d 1429, 1433 (8th Cir. 1995). Furthermore, "[o]nce the government establishes the existence of a drug conspiracy, only slight evidence linking the defendant to the conspiracy is required to prove the defendant's involvement and support the conviction." United States v. Beckman, 222 F.3d 512, 521 (8th Cir. 2000) (quotation omitted).

Parker relies on his co-defendant's acquittal to show that there is no evidence that he had knowledge of the conspiracy. Parker also emphasizes that the only witness who connected him to the conspiracy and the drugs was Young, someone who had met Parker only once, had recently been convicted of various felonies, and who had entered into a plea agreement with the government to testify in exchange for a reduced sentence. To the contrary, however, we find that the evidence overwhelmingly supports the conspiracy conviction both through direct evidence of the conspiracy, and through Parker's own actions. Mines's testimony at trial confirmed a PCP manufacturing and distribution conspiracy involving himself, Walker, and Young. Young testified that he had an agreement with Walker and Foster to obtain PCP in cans, label the cans "March 25, 2006," place them in cardboard boxes marked "Consolidated Can Products," and then transport the boxes to Mines in Philadelphia. A search pursuant to a valid warrant led law enforcement to Foster and Walker's manufacturing location, confirming the conspiracy. Walker and Foster explicitly told Young they would transport the PCP using the driving services of Herm, who Young later identified as Parker. Young testified that Parker was chosen to transport the drugs after Walker and Foster assured Young that Parker had "done this before," and that

Parker had agreed to transport the drugs to Philadelphia. Additionally, Parker's direct connection to the conspiracy was further established through evidence of the PCP in cans labeled "March 25, 2006," found in cardboard boxes labeled "Consolidated Can," that were discovered in the vehicles Parker transported. Agent Henry found five cell phones in Parker's possession, one registered to a "Herman Michelle," and two of which had been used to contact Walker, another member of the conspiracy. Also, several documents belonging to Foster—who was directly involved in the conspiracy—were found in the Excursion with the PCP. Therefore, the evidence was sufficient for the jury to convict Parker of the conspiracy.

Next, to establish possession and intent to distribute the PCP and cocaine, the government has the burden of proving beyond a reasonable doubt that Parker both knowingly possessed and intended to distribute the drugs. Pace, 922 F.2d at 452. Possession may be actual or constructive. United States v. Ojeda, 23 F.3d 1473, 1475 (8th Cir. 1994). For constructive possession, a defendant must have "knowledge of an object, the ability to control it, and the intent to do so." United States v. Lee, 356 F.3d 831, 837 (8th Cir. 2003). A defendant's control and dominion over a vehicle can indicate knowledge. United States v. Jimenez, 478 F.3d 929, 933 (8th Cir. 2007). Knowledge can also be established by a "large quantity of drugs" because "[e]ven if the drugs were not owned by the defendant[], it is unlikely that the owner would place [a large quantity] of [drugs] in the hands of people who do not even know it is there." United States v. Serrano-Lopez, 366 F.3d 628, 635 (8th Cir. 2004); cf. Maryland v. Pringle, 540 U.S. 366, 373 (2003) ("The quantity of drugs . . . in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him."). Moreover, a large amount of drugs can also indicate both an intent to distribute and the ability to control the drugs for proof of constructive possession. Serrano-Lopez, 366 F.3d at 635.

Parker claims that there was insufficient evidence to establish knowing possession by focusing on the fact that the cocaine was found behind the back wall of

-12-

a closed glove compartment in a vehicle that Parker did not own. Parker also claims that because there were no fingerprints or other evidence connecting him to the drugs, and because the PCP was found in aluminum cans that were made to eliminate any odors, he did not have knowing possession of the contraband. We disagree. The large quantity of drugs discovered in the vehicles—over which Parker maintained dominion and control as the driver—establishes Parker's constructive possession, knowledge, and intent to distribute. See id.; see also Lee, 356 F.3d at 837. This evidence, combined with the evidence of conspiracy discussed above constitutes sufficient evidence to support the possession with intent to distribute PCP and cocaine convictions.

V.

Accordingly, we affirm the judgment of the district court.

_____