# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2580

_____

United States of America,

        Appellee,

v.

Wade Bohmont,

        Appellant.

_____

No. 09-2592

_____

United States of America,

        Appellee,

v.

Colton D. Inmon,

        Appellant.

*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*   Appeals from the United States
*   District Court for the
*   Western District of Missouri.
*
*   [UNPUBLISHED]
*
*
*
*
*
*
*
*
*
*

_____

Submitted: April 14, 2010
Filed: March 25, 2011

_____

Before BYE, GIBSON,[1] and HANSEN, Circuit Judges.

_____

PER CURIAM.

Wade Bohmont and Colton Inmon were tried in a joint trial for conspiring to distribute five grams or more of methamphetamine and for possessing with the intent to distribute five or more grams of methamphetamine. Bohmont was convicted on both counts; Inmon was acquitted of the possession count but convicted of the conspiracy count. They each appeal the district court's[2] denial of their motions to suppress evidence gathered during an unwarranted search of Inmon's hotel room and the district court's[3] denial of their motions for judgment of acquittal on the conspiracy count based on insufficient evidence. Bohmont also brings separate challenges to his conviction. We affirm.

I.

Late on the evening of May 17, 2006, Colton Inmon rented room 423 at the Holiday Inn Express in Springfield, Missouri, for one night. He was the only registered guest, and he paid the rate consistent with a single guest. A security guard on duty, Francis Bastean, was at the front desk when Inmon checked in, and he

_____

[1]The Honorable John R. Gibson retired from service on this court on January 26, 2011. This opinion is being filed by the remaining judges of the panel pursuant to 8th Cir. Rule 47E. The judgment is consistent with the views expressed by Judge Gibson in the judges' conference following oral argument.

[2]The Honorable Gary E. Fenner, United States District Judge for the Western District of Missouri, adopting the Report and Recommendation of United States Magistrate Judge James C. England.

[3]The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

observed Inmon leave the hotel and return several times, twice accompanied by other people. When Inmon returned the third time, he was accompanied by a male, later identified as Wade Bohmont, and a female named Tasha Cook. Inmon, Bohmont, and Cook left a short time later, and Bohmont and Cook returned with personal belongings. Each time Inmon left, he carried a black satchel-like bag.

At approximately 3:15 a.m., an individual asked the front desk for directions to room 423. After that inquiry, Mr. Bastean become concerned with the amount of traffic in and out of room 423, and he called the police. Officers Ronald Cole and John Stuart of the Springfield Police Department responded to the call at 3:45 a.m. and knocked on the door to room 423. Although they heard voices and sounds from the television when they first knocked, the room became very quiet and no one answered the door. The officers returned to the lobby, where Mr. Bastean informed the officers that Inmon had not yet returned to the hotel. While waiting for Inmon to return, Officer Cole ran a records check and discovered that Inmon's driver's license had expired. Inmon drove into the hotel parking lot a short time later, and the officers arrested him for driving without a valid license. At the time of his arrest, Inmon had a glass "meth" pipe in his back pocket, and the officers located a pair of brass knuckles and a knife in the car. The officers asked Inmon if anyone was in his hotel room, and he responded that he had given Spanky (later determined to be Bohmont's nickname) a key, but that he had already left. Inmon also claimed that he had left the hotel only once.

The officers took Inmon inside the hotel lobby and told Mr. Bastean that they were taking Inmon to jail. Mr. Bastean asked the officers to remove the non-registered individuals from room 423. The officers, accompanied by Inmon and Mr. Bastean, returned to room 423, where Mr. Bastean unlocked the door with a key card. During this time, Inmon repeatedly told the officers that no one was in the room, but Mr. Bastean was unable to open the door because it had been latched from the inside. The officers knocked several times, identified themselves, and told the occupants they

-3-

needed to come out because they were no longer allowed inside. No one responded. Mr. Bastean told the officers to use any force to open the door, and Officer Cole broke the latch. Inside, the officers found Bohmont, Cook, and a third individual identified as Timmy Turbyeville, who was attempting to hide under the bed. The officers arrested the three for trespassing, and they then searched the room. The officers discovered several bags of methamphetamine inside a fanny pack, a blue duffel bag, and a black bag. The officers also found unused plastic baggies, a black palm scale, a .45 caliber handgun, a white powder identified as MSM that is typically used to cut methamphetamine, and other drug paraphernalia. Inside the blue duffel bag, the officers found a drug ledger, with references to a motorcycle rally on the Bohmont family ranch and entries labeled "Tim" and "Colt."

Bohmont, Inmon, and Turbyeville were each charged by indictment with two counts: count I, conspiring to distribute five grams or more of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(B)(viii); and count II, possessing with intent to distribute five or more grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii). Turbyeville pleaded guilty and agreed to testify against Bohmont and Inmon in exchange for the Government's promise to recommend a substantial assistance departure at his sentencing. Bohmont and Inmon filed a motion to suppress the fruits of the search of the hotel room. That motion was denied, and the case went to trial. A jury returned guilty verdicts on both counts against Bohmont and on the conspiracy count against Inmon. Inmon was acquitted of the possession count. Bohmont and Inmon both appeal.

II.

Bohmont and Inmon both appeal the denial of their motions to suppress evidence found following the search of the hotel room, as well as the denial of their motions for judgment of acquittal or for a new trial based on insufficient evidence. Bohmont raises several separate issues, including a Confrontation Clause challenge

to the limited cross-examination of a DEA chemist; evidentiary challenges to the district court's rulings concerning the drug ledger, the chain of custody for the methamphetamine and the related lab reports, and Bohmont's prior convictions; and the denial of Bohmont's motion for a new trial based on newly discovered evidence that a government witness tested positive for methamphetamine during trial.[4]  We address each argument in turn.

A.  Motion to Suppress

Bohmont and Inmon both challenge the district court's denial of their motions to suppress the evidence seized following the officers' search of the hotel room, arguing that the officers violated their Fourth Amendment rights to be free of unreasonable searches.  See U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .").  We review a district court's factual findings supporting its denial of a motion to suppress for clear error, and we review its legal conclusion that the Fourth Amendment was not violated *de novo*.  See United States

_____

[4]Inmon listed in his brief, page 2, the following two issues for review: 1) the denial of his motion to suppress and 2) whether there was sufficient evidence to convict him of conspiracy to distribute methamphetamine, as required by Federal Rule of Appellate Procedure 28(a)(5).  He also included a separate "Statement Regarding Adoption of Briefs of Other Parties," which reads: "Appellant Inmon hereby adopts the factual and legal arguments set out in the brief of appellant Wade Bohmont."  We construe that statement as an effort by Inmon pursuant to Federal Rule of Appellate Procedure 28(i) to adopt the factual and legal arguments made in Bohmont's brief with respect to the two specific issues listed by Inmon for review, and we permit it.  We will not permit the adoption statement to expand the listing of the two specific issues set out in Inmon's formal Statement of the Issues to include the other issues listed by Bohmont in his Statement of Issues.  The matter is largely an academic one; our review of Bohmont's arguments on the issues not listed by Inmon does not disclose any reason to grant Inmon relief even if they had been listed in Inmon's statement of issues.

v. Randolph, 628 F.3d 1022, 1024 (8th Cir. 2011). The Fourth Amendment's "protection against unreasonable searches and seizures extends to a person's privacy in temporary dwelling places such as hotel or motel rooms." United States v. Conner, 127 F.3d 663, 666 (8th Cir. 1997). Nonetheless, "in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88 (1998). An expectation of privacy in the place searched is defined as "one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" Id. (quoting Rakas v. Illinois, 439 U.S. 128, 143-44 (1978)).

We address Inmon's and Bohmont's Fourth Amendment challenges separately, as each can rely only on his own expectation of privacy. Inmon rented the room that the officers searched, giving him a reasonable expectation of privacy in the room. See Conner, 127 F.3d at 666. However, once he was arrested and the officers told the hotel security guard they were taking Inmon to jail, the security guard asked the officers to remove all other guests from Inmon's room, as he considered them to be trespassers with no legitimate basis for being in the room. The officers took Inmon to the room with them when they went to evict the other occupants at Mr. Bastean's request, and Inmon was present when the officers knocked on the door and told the occupants they had to leave because they were trespassing. Even though Mr. Bastean did not explicitly tell Inmon that he had been evicted from the hotel, we believe these facts are sufficient to establish that Inmon had in fact been evicted. Missouri law allows a hotel to eject a person if the hotel operator "reasonably believes that the individual is using the premises for an unlawful purpose." Mo. Rev. Stat. § 315.075(3). Mr. Bastean called the police because of concerns that the room was being used to traffic drugs. The officers' discovery of drug paraphernalia on Inmon's person was sufficient to justify Mr. Bastean's concern that there were illegal drugs in the room and allow him to eject Inmon when the officers arrested him and told Mr.

-6-

Bastean they were taking Inmon to jail. Under our precedent, once an individual is lawfully ejected from a hotel, the rental period terminates and "control over the hotel room revert[s] to the management." United States v. Rambo, 789 F.2d 1289, 1295-96 (8th Cir. 1986) (holding that a hotel occupant who was asked to leave by police officers acting on behalf of hotel management who complained of defendant's disorderly behavior was justifiably ejected under state law and no longer had a reasonable expectation of privacy in the hotel room); see also Young v. Harrison, 284 F.3d 863, 869 (8th Cir. 2002) (holding that defendant "was justifiably evicted from the hotel because his friends created a disturbance" despite absence of any state statute addressing evictions from a hotel, such that "the control over the hotel room reverted to the management and [the defendant] '[could] not assert an expectation of being free from police intrusion upon his solitude and privacy in a place from which he has been justifiably expelled'" (quoting Rambo, 789 F.2d at 1296)). Thus, at the time the officers forcibly entered the hotel room at Mr. Bastean's request, Inmon had no reasonable expectation of privacy in the hotel room, and the subsequent search of the room did not violate his Fourth Amendment rights.

Bohmont's expectation of privacy in Inmon's hotel room is even more attenuated. Bohmont did not rent the room, and the district court determined that he was not Inmon's overnight guest but rather was nothing "more than [a] 'mere visitor[] in the room.'" (R&R at 14.) This distinction deprives Bohmont of a protected privacy interest in the hotel room; although "an overnight guest in a home may claim the protection of the Fourth Amendment, . . . one who is merely present with the consent of the householder may not." Carter, 525 U.S. at 90. Having carefully reviewed the record, we conclude that the district court's determination that Bohmont was a "mere visitor" is not clearly erroneous. The finding is further supported by Turbyeville's testimony that he went to the hotel room to purchase automobile rims from Bohmont, indicating that Bohmont was present in the room for purposes of carrying out a commercial transaction. As noted by the Supreme Court, individuals have less of an expectation of privacy in commercial property than in residential

property.  See id. (concluding that a visitor present temporarily for a few hours to carry out the commercial activity of bagging drugs had no reasonable expectation of privacy in the home); United States v. Sturgis, 238 F.3d 956, 958-59 (8th Cir.) (holding that a visitor to a hotel room for purposes of distributing drugs failed to establish a reasonable expectation of privacy in the room), cert. denied, 534 U.S. 880 (2001).  The Sturgis court relied on the facts that the defendant did not rent the room, was not an overnight guest, and was present only to deal drugs—a commercial activity—to hold that the defendant had no interest in the room protected by the Fourth Amendment.  Sturgis, 238 F.3d at 958-59.  Bohmont is in the same position as the defendant in Sturgis, and we are bound by its holding.[5]  Bohmont had no reasonable expectation of privacy in Inmon's room, and therefore his Fourth Amendment rights were not violated by the officers' search.

B.      Sufficiency of the Evidence

Bohmont and Inmon both challenge the sufficiency of the evidence to support the conspiracy count.[6]  We review *de novo* a district court's denial of a motion for judgment of acquittal based on insufficient evidence, looking at whether the evidence presented at trial was sufficient to sustain the conviction.  United States v. Parker, 587 F.3d 871, 880 (8th Cir. 2009).  Our review requires us to view the evidence in the light most favorable to the government and to give the government the benefit of all reasonable inferences.  Id.  "Although we may not again weigh the evidence presented

_____

[5]As in Sturgis, we affirm the district court's holding that Bohmont failed to establish a reasonable expectation of privacy, although we disagree with the district court's use of "standing" terminology to reach that conclusion.  See 238 F.3d at 958 (citing Carter, 525 U.S. at 87-88 as "reaffirm[ing the Court's] earlier rejection of 'standing' nomenclature").

[6]Bohmont was also convicted of possessing with the intent to distribute five or more grams of methamphetamine.  He does not challenge the sufficiency of the evidence supporting the possession charge, and we do not address it.

at trial, it is our task to determine if there is enough evidence in this record that could support a guilty verdict." Id. (internal quotations, citations, and marks omitted). "A verdict will only be overturned if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Bowie, 618 F.3d 802, 812 (8th Cir. 2010) (internal marks omitted), cert. denied, 131 S. Ct. 954 (2011) and cert. denied, 2011 WL 307993 (2011).

> To establish the existence of a conspiracy, the government has the burden of proving that there was a conspiracy with an illegal purpose, that the defendant was aware of the conspiracy, that he knowingly became a part of it, and that he entered into an agreement with at least one other person and that the agreement had as its objective a violation of law. Existence of the agreement can be established through circumstantial evidence[] and can be inferred through the parties' actions. Furthermore, a defendant may be convicted for even a minor role in a conspiracy, so long as the government proves beyond a reasonable doubt that he or she was a member of the conspiracy.

Parker, 587 F.3d at 880 (internal quotations, citations, and marks omitted).

The indictment charged that, beginning on an unknown date at least as early as May 17, 2006 to May 18, 2006, Inmon, Bohmont, and Turbyeville conspired to distribute five grams or more of methamphetamine. Construing the evidence in the light most favorable to the guilty verdict, the three were arrested in the early morning hours of May 18, 2006, Bohmont and Turbyeville in a room with over 157 grams of a mixture containing methamphetamine, nearly 40 grams of which was pure methamphetamine. The methamphetamine was packaged in separate baggies consistent with distribution. Also found in the room were a cutting agent often used to dilute methamphetamine, unused baggies, a scale, a handgun, over $4,000 in currency, and a measuring spoon covered with a white residue—all indications of drug distribution. The room was rented by Inmon, who came and went from the room several times with different visitors, one of whom was Bohmont. When Turbyeville

-9-

arrived at the hotel room, Inmon directed him to the back bedroom where Bohmont and Cook were with the drugs. The evidence established that Turbyeville had purchased methamphetamine from Bohmont for at least two years prior to their arrest and that he often sold some of the methamphetamine he purchased to others to help pay for his addiction. Turbyeville testified that he had purchased distribution quantities from Bohmont in the past and that he paid Bohmont $1,000 for methamphetamine that Bohmont had not been able to supply because he was on the run from law enforcement. Turbyeville testified that he got methamphetamine from Bohmont's brothers when he could not contact Bohmont. Although Turbyeville went to the hotel to look at truck rims Bohmont had brought back from St. Louis for him, he also hoped to get methamphetamine from Bohmont that night and, as was his custom in their relationship, would have resold some of it to pay for what he used. When police knocked on the door, Bohmont threw some of the drugs to Turbyeville to hide or dispose of, and Turbyeville threw them back in the drawer out of which Bohmont had taken the drugs. A duffel bag containing mail addressed to Bohmont also contained a drug ledger with entries for the names "Colt" and "Tim," which the jury could have determined referred to Colton Inmon and Tim Turbyeville.

There is sufficient evidence from which a jury could conclude that Bohmont was distributing drugs from the hotel room based on the quantity of drugs present in the hotel room, the additional distribution items found, Bohmont's access to the drugs in the drawer, and the presence of the drug ledger that the jury could have found belonged to Bohmont. See United States v. Vanover, 630 F.3d 1108, 1116-17 (8th Cir. 2011) (sufficient evidence to support conspiracy charge from quantity of drugs and items of drug trade found in defendant's home). The evidence is also sufficient to establish that Bohmont and Turbyeville had an agreement for Turbyeville to purchase methamphetamine from Bohmont, some of which he resold to others, and that the agreement began prior to May 17, 2006 and continued to that date. See United States v. Delpit, 94 F.3d 1134, 1152 (8th Cir. 1996) ("[A] series of drug deals for resale can prove a conspiracy to distribute."). Given this evidence, a reasonable

-10-

juror could have found Bohmont guilty of conspiring to distribute methamphetamine on the night he was arrested.

The evidence also supports Inmon's conspiracy conviction. The jury could have concluded that Inmon knowingly provided the room for the distribution of methamphetamine from the circumstantial evidence that Inmon rented the room and had a lot of late night traffic to and from his room; that, upon Turbyeville's arrival to the room, Inmon directed Turbyeville, an individual he did not know, to the back bedroom where Bohmont was with the drugs; that Inmon allowed Bohmont, Cook, and Turbyeville to remain in his room while he was gone; that Bohmont called Inmon when the police knocked on the door, indicating that Bohmont considered Inmon part of the conspiracy; and that Inmon repeatedly told the officers and the security guard that no one was in his room as they returned to evict the nonregistered occupants of the room after Inmon's arrest, from which a jury could conclude that Inmon knew the room contained illegal drugs. Although it is not a strong case, there is sufficient evidence from which a jury could conclude that Inmon knowingly allowed Bohmont to distribute drugs from his hotel room such that Inmon's conviction for conspiracy to distribute methamphetamine is supported by substantial evidence. See United States v. Grimaldo, 214 F.3d 967, 976 (8th Cir. 2000) ("Because the evidence sustains the conclusion that Escobedo-Romero knowingly allowed his apartment to be used for the storage and distribution of methamphetamine, substantial evidence supports his conviction for conspiracy."), cert. denied, 531 U.S. 939 (2001).

C.    Bohmont's Separate Challenges

1.    Confrontation Clause Challenge

Bohmont argues that the district court violated his constitutional right to confront the witnesses against him when the court limited his counsel's cross-examination of government witness Anthony Harris, who was the Drug Enforcement

Administration (DEA) forensic chemist who originally tested the drugs recovered from the hotel room. Specifically, Bohmont takes issue with the court's ruling that precluded defense counsel from inquiring into the specific incidents addressed in DEA disciplinary letters directed to Harris.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Although the Sixth Amendment guarantee includes an opportunity for effective cross-examination, see United States v. Dale, 614 F.3d 942, 956 (8th Cir. 2010), petitions for cert. filed, __ U.S.L.W. __ (U.S. Nov. 27, 2010) (No. 10-7835) and __ U.S.L.W. __ (U.S. Dec. 1, 2010) (No. 10-7815), that right is not unfettered. "District courts 'retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant.'" Id. (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). To state a viable Confrontation Clause challenge to the district court's decision to limit cross-examination, the defendant must establish "that a reasonable jury might have received a significantly different impression of a witness's credibility had counsel been permitted to pursue the proposed line of cross-examination." Id. at 957. We will grant relief based on a district court's decision to limit cross-examination only if the district court clearly abused its discretion and the defendant was thereby prejudiced. See United States v. Love, 329 F.3d 981, 984 (8th Cir. 2003).

On direct examination, the government questioned Mr. Harris about the chain of custody of the drugs. Mr. Harris testified that he retrieved the drugs from their secure location; combined, weighed, and tested the drugs; and resealed them. He did not testify as to whether the drugs tested positive for methamphetamine. Harris also testified on direct examination that he had received a letter of reprimand and a letter of inattention to duty, and that he was appealing his pending termination from DEA

employment. In two separate unsolicited answers, he offered that the alleged errors were clerical in nature. The Government also elicited from Harris that he was under close supervision at the time he worked on this case and that he was not notified of any errors in his work in this case. Another DEA chemist, Robert Krefft, later retested the drugs and testified at trial about the quantities of the drugs involved, identifying the drugs as methamphetamine. Harris's supervisor, Camela Dubach, testified that she closely supervised Harris's work product during the time that he worked on this particular case based on prior administrative errors. In response to a question about whether Harris made any errors in this case that required correction, Ms. Dubach testified, "There could have been some administrative errors." (Trial Tr. at 315.)

Defense counsel was allowed to cross-examine Harris fully about his conduct relevant to the exhibits at issue in this case and to inquire into the general process of logging and handling evidence in the lab. When defense counsel questioned Harris about the alleged clerical errors he had mentioned during his direct examination, Harris testified that he had never lost or misidentified a piece of evidence. Defense counsel sought to inquire into a list of infractions discussed in one of the reprimand letters Harris received from the DEA, but the district court limited the cross-examination to the facts of Harris's work on the pending case, noting that it was not going to let the trial turn into a mini-trial of Mr. Harris. We have carefully reviewed the testimony, and we conclude that the testimony Bohmont's counsel attempted to elicit would have been cumulative to the evidence already before the jury. See United States v. Street, 548 F.3d 618, 627 (8th Cir. 2008). The jury already knew that Mr. Harris had been terminated from the DEA based on concerns with his performance as a forensic chemist. Allowing counsel to question Mr. Harris about specific acts concerning other unrelated cases would not have given the jury "a significantly different impression of [Mr. Harris's] credibility," Dale, 614 F.3d at 957, such that the district court did not abuse its discretion in limiting the cross-examination of Mr. Harris to his work in the case at hand.

-13-

2.      Evidentiary Challenges

Bohmont challenges three evidentiary rulings. The first concerns the admissibiltiy of the drug ledger found in the hotel room. Bohmont claims the ledger should have been excluded because it was not properly authenticated and because it was inadmissible hearsay. "We review a district court's evidentiary rulings for abuse of discretion." United States v. Koch, 625 F.3d 470, 479 (8th Cir. 2010).

The Federal Rules of Evidence require that items admitted at trial be authenticated with "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). The contents and appearance of an item can be used in conjunction with circumstantial evidence to authenticate an item. See Fed. R. Evid. 901(b)(4). Officer Cole testified that he found a blue bag in the hotel room in the lower drawer of the television stand and that, among other items, the blue bag contained a notebook. Officer Cole described the notebook as similar to drug ledgers found in other narcotics cases, noting that it contained entries with the names "Tim" and "Colt." The notebook also contained a reference to a rally held on the Bohmont family ranch. Officer Cole testified that a black pouch containing marijuana and a measuring spoon with a white substance were found in the same blue bag, as well as a birthday party invitation addressed to "Spanky," a nickname used by Bohmont. The evidence offered was sufficient to establish that the notebook was related to the charged conspiracy; it was found in a bag with drugs and a card addressed to Bohmont. Officer Cole did not testify that the notebook belonged to Bohmont, although there was sufficient circumstantial evidence to allow the jury to infer that it did. The drug ledger was properly authenticated.

Bohmont also challenges admission of the drug ledger as impermissible hearsay. The only "statements" admitted from the book were ledger entries for the names "Tim" and "Colt," a notation that said "Save" "half O," and "Shop," and a non-

ledger reference to "Bohmont" and "rally." Officer Vienhage testified that "O" often referred to "ounce" so that the reference to "half O" meant a half ounce. However, none of these "statements" were offered to prove the truth of the matter asserted, i.e. that certain quantities of drugs were sold to certain individuals. Rather, "[i]t is the fact that the statements were written, and not the truth of the statements, which was relevant." Untied States v. Wilson, 532 F.2d 641, 646 (8th Cir.), cert. denied, 429 U.S. 846 (1976); see also United States v. Charles, 366 Fed. Appx. 532, 543 (5th Cir.) (unpublished) ("[I]t did not matter if what . . . appeared to be standard entries listing quantities of drugs and the prices for which they were sold were actually sold or sold in that actual quantity or for that actual price. Rather, it was the existence of the entries that had significance, independent of their veracity."), cert. denied, 130 S. Ct. 3488 (2010). The ledger was "admitted to show that the type of activities charged in the indictment were being carried out in the" hotel room. United States v. Huguez-Ibarra, 954 F.2d 546, 552 (9th Cir. 1992). Contrary to Bohmont's assertion, the officer testified that the quantities of drugs found in the room were distribution amounts; he did not testify that the half ounce referenced in the ledger was a distribution amount. Admission of the ledger did not violate the hearsay rules.

Bohmont's next evidentiary argument challenges the admissibility of some of the methamphetamine found in the hotel room and the corresponding lab reports based on an improper chain of custody. The officers located a black bag containing five individual baggies of drugs during the search, and the black bag was inadvertently left in the hotel room following the early morning search. A Holiday Inn employee found the bag later the same morning, gave it to a housekeeping employee, who gave it to the manager on duty, who contacted the Springfield police department, who sent an officer to pick it up. The black bag and the five baggies were then inventoried and placed in the police department's evidence room and ultimately made their way to the DEA.

"Where a physical object is offered as evidence in a criminal prosecution, an adequate foundation for the admission of that object requires testimony first, that such object is the same object which was involved in the alleged incident, and that the condition of that object is substantially unchanged." United States v. Robinson, 617 F.3d 984, 990 (8th Cir. 2010) (internal marks omitted). The district court must satisfy itself that there is a reasonable probability that the physical evidence has not been changed or altered. Id. The district court is allowed to presume that the integrity of physical evidence has been preserved absent a showing of bad faith, ill will, or actual proof that someone has tampered with the evidence. Id.

The Holiday Inn employees who discovered the black bag testified at trial about the discovery of the bag and what they did with it. Officer Cole, who found the black bag during the search of the hotel room, testified that he took photographs of the bag and its contents when it was originally discovered, including five baggies of a substance that appeared to be methamphetamine, and the photographs were admitted at trial. The DEA chemists testified about their handling of the drugs when they tested them. To the extent there may have been a gap in the chain between the time the officers left the bag in the hotel and they recovered it later that morning from hotel employees, "gaps in the chain of custody normally go to the weight of the evidence rather than its admissibility." Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527, 2532 n.1 (2009) (internal marks omitted). Likewise, the concerns Bohmont raises related to DEA chemist Harris's handling of the drugs go to the weight of the evidence, not its admissibility. Harris's supervisor testified that he was under close supervision during the time Harris was involved in this case. Without evidence of bad faith, ill will, or actual tampering, the district court did not abuse its discretion in presuming the integrity of the evidence was preserved between the time it was discovered in the hotel room and it was offered into evidence at trial. See Robinson, 617 F.3d at 990.

Finally, Bohmont challenges the district court's ruling admitting into evidence his two prior state convictions for possession of marijuana with intent to distribute and for possession of ephedrine with intent to manufacture methamphetamine. We review a district court's decision to admit evidence of a defendant's prior convictions for an abuse of discretion, United States v. Turner, 583 F.3d 1062, 1065 (8th Cir. 2009), cert. denied, 130 S. Ct. 1928 (2010), and "[w]e will reverse only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts," United States v. Gaddy, 532 F.3d 783, 789 (8th Cir.) (internal marks omitted), cert. denied, 129 S. Ct. 587 (2008). The district court may not allow evidence of prior convictions "to prove the character of a person in order to show action in conformity therewith," Fed. R. Evid. 404(b), but it may allow such evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," id. Admission of prior convictions for one of these limited purposes is subject to the district court's wide discretion to exclude evidence where "its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. See also United States v. Steele, 550 F.3d 693, 700 (8th Cir. 2008).

Bohmont argues that admission of his prior convictions was unduly prejudicial because the prior crimes related to a different type of drug and were irrelevant to the limited 24-hour conspiracy alleged in the current charges. "We have frequently upheld the admission of prior drug convictions for the purpose of proving intent and knowledge where the defendant denied the charged drug offense," United States v. Cole, 537 F.3d 923, 928 (8th Cir.), cert. denied, 129 S. Ct. 751 (2008), as Bohmont did here. Bohmont was charged with possession with intent to distribute and with conspiracy to distribute methamphetamine. One of his prior convictions involved drug distribution, and the other involved intent to manufacture the same type of drug involved in the current case. Further, the drugs involved in the prior convictions need not be the same as those involved in the charged offense to be relevant to a defendant's knowledge and intent to distribute controlled substances. See Gaddy, 532

F.3d at 789-90 (past conviction for distributing marijuana admissible to show intent and knowledge in charge for distributing cocaine). The fact that the current charged conspiracy was of a short duration does not make the prior convictions irrelevant. The district court did not abuse its discretion in admitting Bohmont's prior convictions.

      3.     Newly Discovered Evidence

Bohmont argues that he should be given a new trial based on newly discovered evidence that Turbyeville, a Government witness, submitted a methamphetamine-positive urine sample on the day he testified at trial. We review the denial of a motion for a new trial based on newly discovered evidence under an abuse of discretion standard. United States v. Grover, 511 F.3d 779, 783 (8th Cir. 2007). Newly discovered evidence entitles a defendant to a new trial only if he can prove that (1) the evidence was either unknown or unavailable at the time of trial, (2) the defendant was diligent in discovering it, (3) the new evidence is material, and (4) the evidence is likely to result in an acquittal in a new trial. Id.

Bohmont asserts that the information about Turbyeville testing positive for methamphetamine on the day he testified at trial would have been material to Turbyeville's credibility. However, the jury heard other evidence that Turbyeville was a methamphetamine addict and went to the hotel looking for methamphetamine. At most, this new evidence is cumulative impeachment evidence, which does not support a motion for new trial based on newly discovered evidence. See id. ("The motion is properly denied if the newly discovered evidence is merely cumulative or impeaching."). The district court did not abuse its discretion in denying Bohmont's motion for a new trial.

III.

For the foregoing reasons, the district court's judgments and Bohmont's and Inmon's convictions are affirmed.

_____